838 A.2d 404

**FIRST UNION NATIONAL BANK**

v.

**STEELE SOFTWARE SYSTEMS CORPORATION.**

No. 1061, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 17, 2003.

98

Andrew L. Frey (Lauren R. Goldman, Mayer, Brown, Rowe & Maw, on the brief), all of New York, NY. (Miriam R. Nemetz, Mayer, Brown, Rowe & Maw, on the brief), of Washington, D.C. (James E. Gray, Stephen E. Marshall,

Mitchell Y Mirviss, Venable, Baetjer and Howard, L.L.P., on the brief), all of Baltimore, for appellant.

Laurence H. Tribe (Harvard University Hauser Hall, on the brief), of Cambridge, MA. (Stephen L. Snyder, Andrew G. Slutkin, Mark C. Kopec, Snyder, Slutkin, Lodowski & Kopec, on the brief), (Byron L. Warnken, on the brief), of Baltimore, for appellee.

Panel: ADKINS, KRAUSER, and THEODORE G. BLOOM, (Retired, Specially Assigned) JJ.

ADKINS, Judge.

In this high stakes business dispute, we are asked to review evidence of a lengthy business negotiation between a large bank and one of its vendors that culminated in a written contract, and the bank's deliberate breach of that contract. We must determine whether the evidence was sufficient to support the vendor's claim that the bank, never intending to perform, fraudulently induced the vendor to enter the contract. In doing so, we differentiate between actionable fraudulent misrepresentations and indefinite generalities that do not support fraud in the context of discussions between two sophisticated businesses. We also analyze whether an ambiguous "best efforts" clause is enforceable in contract, and explore the limits of predicating a fraud claim on the bank's intentions with respect to performance of that clause.

We shall reverse a $39 million jury verdict for compensatory damages and a $200 million verdict for punitive damages, both entered against appellant First Union National Bank ("First Union") in favor of Steele Software Systems Corporation ("3S") on a fraud theory. 3S's theory was that First Union fraudulently induced 3S to enter into a written Service Agreement dated November 29, 1997 ("SA"), under which 3S would provide certain appraisal and title services in connection with residential real estate loans made by First Union to its customers without intending to perform thereunder. We shall affirm a judgment for approximately $37 million against First Union for breach of contract. The recovery by 3S is based on

First Union's failure to fulfill its contractual obligation to purchase these real estate settlement services from 3S as called for under the SA.

We answer the following questions presented by First Union:

I. Whether First Union was entitled to judgment on 3S's fraud claim because 3S failed to prove the elements of fraud.

II. Whether First Union is entitled to judgment with respect to 3S's claim that it breached the "best efforts" clause of the SA.

III. Whether the compensatory damages award must be set aside because the circuit court impermissibly limited the cross-examination of 3S's damages expert.

IV. Whether the compensatory damage award must be set aside because it encompassed transactions outside the geographic scope of the SA.

We answer yes to question I, and no to questions II, III, and IV. We do not reach First Union's questions regarding the amount of damages in the fraud claim, or the amount of punitive damages, because of our rejection of 3S's fraud claim. Nor do we reach First Union's contention that 3S's fraud claim was improperly predicated on alleged theft of its business methods and is therefore preempted by the Maryland Uniform Trade Secrets Act.

## FACTS[1] AND LEGAL PROCEEDINGS

### 3S Provides Settlement Services To First Union

3S is a settlement service company, founded in 1987, that introduced First Union to a new, centralized and automated system for obtaining title searches and appraisals for home equity loans. First Union, a large bank with multiple branches in the eastern United States, makes a high volume of residential home equity loans. The new system introduced by

---

1. In setting forth these facts, we have resolved all conflicts in evidence in favor of 3S.

3S enabled First Union to move away from a paper-based title search and appraisal system that was individual to each branch, to a computer-based, centralized system.

3S first made a presentation about an automated title and appraisal processing system known as "ATAPS" to Glenn Kinard, manager of First Union's consumer lending business in Washington, D.C., in the fall of 1994. Kinard retained 3S to conduct a pilot program at a few First Union branches in the D.C. region. During the pilot, an email sent by First Union to the branches participating in the pilot said, "You are the pilot group testing this method of processing for the entire company, so your active participation in the use and evaluation of 3S is the cornerstone for our future efforts."

3S later began serving 15 to 20 branches in that area. First Union also retained 3S to automate and centralize a pilot direct mail campaign for home equity loans in Roanoke, Virginia. 3S then performed the title searches and appraisals associated with the transactions generated by the campaign. Scott Steele advised Kinard that 3S could bring centralized, automation technology and standardization to First Union. Kinard was "very excited" about this program.

Kinard told Steele that "this is such a unique opportunity, I want to get you to [First Union's headquarters in] Charlotte sooner [rather] than later." At First Union's request, Steele and another 3S officer flew to Charlotte and made a presentation to First Union officers Tom Muse, Parkes Dibble, Trent Thompson, and Doug Crisp. Parkes Dibble, vice president of Risk Management, told Steele at the meeting "that if everything I had presented, at a high level again, was real, and they had an opportunity to do due diligence and inspect what I had, that they would see this as being a long-term mutually beneficial relationship." According to Steele, Dibble also told him that "if we delivered on our promise to deliver the concept of centralization and automation, executed what we were supposed to do, and helped them in their endeavor, that we would be their long-term partner.... We could be the beneficiary of all the transactions that they could send to us."

At that same meeting Crisp, First Union's senior officer in charge of the Consumer Credit Division, asked Steele whether his firm "could handle 12,000 transactions on a monthly basis." [2] Steele told Crisp that he "could not" at that time, but that he "could put together and implement a staged process where [3S] could build to that level." Crisp later told him that Steele's honesty "made [Crisp] feel really good, and he figured he would leave it to Parkes [Dibble] to work out the rest."

In his testimony, Dibble confirmed that he and Steele discussed a potential ten-year relationship, adding, "my term of relationship goes on for a long time." Dibble explained that First Union would attempt to give 3S all the transactions it could handle within First Union's "2,000 approximate branch blueprint": "I would put him in a position to where he could get that. That is correct." "It was not an exclusive, it was not meant to be everything, but that he could handle a significant portion of volume, yes." Dibble considered that a contract between the bank and 3S would be the "first step to a long road partnership." Dibble thought that 3S's system provided a "big competitive advantage to the bank." Doug Crisp, a senior vice president and Dibble's boss, acknowledged that he was aware that Dibble was "discussing a long-term relationship" with 3S.

On January 23, 1995, Dibble brought Muse, Thompson, and other officers of the bank to Baltimore to inspect 3S. Steele told them that the presentation "was confidential in nature and [he] expected them to treat it as such." [3] Muse responded, "Don't worry about that. We won't go into this business. We'll just buy the damn thing."

Dibble left First Union in June 1996, and Bill Clewis took over contract negotiations with Steele. Steele testified that when Clewis took over, he told Steele "not to worry. Noth-

---

**2.** Steele clarified that Crisp "didn't say that he had 12,000 transactions to give me. He asked if I could handle them."

**3.** As 3S made clear in its brief and repeatedly at trial, however, its claim against First Union was not a claim for misappropriation of trade secrets. *See* note 16, and accompanying text, *infra*.

ing's changed and he was aware of what I had discussed with Parkes [Dibble] and we were the company and so I trusted these people." Dibble confirmed that, although he never explicitly told Clewis what he said to Steele, "Bill knew pretty much what was going on. It wasn't a one-way communication." Clewis acknowledged that he told Steele, "As we grow, you'll grow." He "expected once we revved up our business, that he would be a vendor, his business would grow with ours." Clewis' supervisor, Crisp, conveyed the same message.

As part of Steele's presentation at the December 8, 1994 and January 23, 1995 meetings, Steele proposed a long term service contract that would have a five-year term with an option for a five-year renewal. According to Dibble, he refused to commit to that term, but said that if 3S delivered on its promises and achieved centralization and automation of home equity loans, 3S would be First Union's "long-term partner."

Dibble said that he believed the competitive advantage that Steele was offering the bank was his electronic method of performing appraisals, "his ability to do on-line appraisals. That was—the bank's attempt was to shorten the home equity cycle by essentially integrating Scott into—from 3S into our application handl[ing] system[.]"

In May 1995, 3S made another presentation to First Union, seeking to sell the bank a range of automated and centralized loan settlement services for all of its offices nationwide. It again proposed that the bank enter into some kind of formal, long-term relationship with it, suggesting that they create a joint venture or that First Union purchase 3S debentures that would give the bank a right of first refusal to acquire the company. Steele explained what a joint venture would mean:

It [was] more of a control business arrangement, where First Union has a volume of transactions that it [is] passing out to third parties today, and not capturing any of that revenue, because they are sending it out to independent third party providers.

Early on, we thought of the concept of taking the business that it [was] passing out, and trying to capture that, and driving it through one entity, thereby sharing the revenue that they are now not participating in....

According to Steele, Dibble responded that there were regulatory barriers to such transactions, but that it was "a great idea and interesting." Dibble later introduced 3S to First Union's Capital Markets division with the idea that First Union might make a capital investment in, or a loan to, 3S, but negotiations broke down because the parties were far apart on a valuation for the company.

### Development Of The Parties' Relationship And Negotiations Leading To The SA

Three years after their first discussions, First Union and 3S entered the SA. Negotiations over the exact terms of this agreement spanned two and a half years, during which 3S provided extensive appraisal and title services for First Union. During this process, 3S's request that the SA explicitly give 3S the right to supply 75% of First Union's needs for appraisal and title services for a five to ten year period was negotiated out. The course of the negotiations, which is important to resolution of this appeal, was reflected in draft agreements, which are outlined below.

### Initial Contract Negotiations Between Steele And Parkes Dibble

The first draft of the SA was a "letter of intent," which Steele sent to Dibble June 10, 1995.[4] It purportedly addressed the "understanding between [the parties] ... concerning First Union's engagement of 3S as First Union's provider of real estate settlement services and other related services...." It called for 3S to be, after a defined transition period, "the exclusive provider to First Union of Real Estate

---

4. This letter of intent purported to be binding on the parties and recited that it would be "followed by final document ... to be prepared and executed shortly after the execution of this letter of intent."

Services for all Home Equity residential and/or consumer mortgages." It also required First Union to purchase from 3S a minimum number of such transactions, although the exact number was left blank. The term of the proposed agreement was five years, "with an automatic renewal period of [five] years provided there are no uncured or incurable defaults at that time." First Union was to have the right to terminate the agreement if 3S increased its price for the services "at a rate higher than 10% annually." First Union did not accept this proposal.

Steele's second draft, in September 1995, proposed, *inter alia,* that

- 3S receive the greater of: 70% of First Union's transactions, or an average of 2,500 transactions per month for the first year, and 7,500 transactions per month thereafter.

- The agreement would be in effect for five years, "and will automatically renew for a like period, unless notice is given by one party to the other at least 30 days prior to any Agreement expiration date."

First Union did not agree to these terms, either.

In March 1996, First Union circulated a draft that had no minimum volume requirement and no exclusivity provision. It simply would have given 3S a non-exclusive right to provide settlement services and direct mail promotions as requested by First Union.

Steele responded to this draft by letter dated March 21, 1996, describing the "changes/ideas that I believe need to be made to the contract." Steele asked for:

- The exclusive right to provide Services and Reports "that are generated by a First Union Mail Promotion," except those for which a bank customer requested to use a settlement attorney of its choice.

- "For all other Services and Reports as required by First Union, [the right to have] First Union ... use its **best efforts to direct these transactions to Steele,** however

this will not be an exclusive right except for the [minimum volume guarantee]." (Emphasis added.)

- A minimum volume equal to the greater of 2,000 transactions per month, or 75% of "new loans generated" after March 31, 1997.
- A term of five years, which would "automatically renew for an additional term" of five years.
- A provision that the agreement "may only be Terminated by First Union for a Material Breach of this Agreement by [3S]."

Around this time, Steele and Dibble discussed that "best efforts" meant "[t]hat they could send all the transactions that he could and that I could handle." First Union did not accept either this proposal, or an April 1996 draft sent by Steele that was similar, but allowed First Union to opt out after five years.

Crisp left First Union, and Dibble's departure followed shortly in June 1996. On June 10, 1996, Steele wrote to Morgan Smith, a First Union officer, saying that "I spoke with Parkes [Dibble] last week and this should finalize the issues to wrap up the Agreement." This time he sought a three year term that would "automatically renew" for an additional three years, and a minimum guarantee of 2,000 packages per month.[5] He requested that the bank "expedite the approvals of these final changes through any channels necessary." A June 19, 1996 draft agreement set forth these requests, including a minimum volume guarantee equal to the greater of 2,000 packages per month or 75% of the bank's new loans generated. This agreement was not signed, and there was a break in negotiations about a contract.

### Business Relationship During Negotiations

Throughout the negotiation period described above, 3S handled "a tremendous amount of work" for First Union and

---

**5.** A "package" consists of a request for both title work and appraisal. A "transaction" would refer to one or the other.

received compensation for it. He testified that by June 1996, 3S's projects for the bank included a two-million-piece direct mail campaign, centralization projects in Roanoke and Washington, D.C., and participation in First Union's "Future Bank Initiative," a long-term project designed to modernize and improve First Union's products and services. Steele testified that, based on First Union's commitment to be 3S's long-term partner, he taught First Union how to centralize and automate its direct mail campaigns for home equity loans.

This project was very appealing to First Union. Steele described the reaction of First Union officials when they first heard about his direct mail campaign proposal:

> The people in the room were blown away. I think Parkes [Dibble] understood it more ... because he was more technology driven, but the rest of the people in the room were just, I think their jaws dropped, ... and certainly you could hear the response from Mrs. Clariss [from First Union's Roanoke office] and the rest of the people in the room. That was the start of our database direct mail project.

### 3S Actions In Anticipation Of Ongoing Relationship With First Union

3S did many things for which it was not compensated because Steele believed that is what a partner should do. In 1995, at Dibble's request, Steele flew to Charlotte to advise First Union about whether an automated teller loan machine, unrelated to 3S business with First Union, would be beneficial to the bank. Crisp told Steele that he "appreciated my immediate response and support of their efforts," that he "looked forward to being our partner," and that he "appreciated everything we were doing." During 3S's implementation of the database direct mail project, Steele discovered that First Union had a "big problem" that prevented automating the direct mail project—the lack of a way to electronically enter customer data into its loan application handling database. Steele offered to help First Union to solve this problem, and did not charge First Union any extra for the five to six weeks

of work it took to write and test the program "because I was doing what a partner should do in helping them support their efforts and doing whatever they asked me to do."

In the fall of 1996, about a year before executing the SA, 3S also substantially increased its transaction capacity, upgrading its computers, adding staff, and moving to a larger facility, all in anticipation of its ongoing relationship with First Union.

### 1997 Resumption Of Negotiations Among Steele, Clewis, And Thompson

In the fall of 1996, Dibble was replaced by Bill Clewis, who was assisted by one of Dibble's previous subordinates, Trent Thompson.[6] Although there was a break in the contract negotiations, Steele said he wasn't worried because Clewis

told me not to worry. Nothing's changed and he was aware of what I had discussed with Parkes [Dibble] and we were the company and so I trusted these people.... Bill was just kind of new in the position so, I mean, I was doing what I was supposed to be doing and we brought the issue of the contract up and Bill said he would get to it in a little bit, which was fine with us.... They were still, you know, requesting us to do things.

Clewis told Steele that he was aware of Steele's discussions with Dibble, and 3S remained First Union's vendor of choice— "nothing's changed." On several occasions, Clewis said to Steele, "As we grow, you'll grow."[7] Although the two men

---

**6.** Both Clewis and Thompson had worked on centralization projects in connection with First Union's Future Bank Initiative. One of the Initiative's goals was to centralize vendor management by performing oversight of settlements through one of First Union's three operations centers. Clewis had participated in First Union's due diligence in connection with its 1995 acquisition of First Fidelity Bank, headquartered in New Jersey, and had learned about centralization in so doing.

**7.** Clewis and Thompson both testified about telling Steele repeatedly that First Union would not " 'put all of [its] eggs in one basket' by using only, or even primarily, one vendor for settlement services." Doing so would eliminate the benefit of vendor competition; it would be risky, because if the vendor had a computer problem or went out of business, First Union would be unable to meet its commitments; and it would

did not discuss the specifics of the earlier contract negotiations, Steele testified that Clewis "knew pretty much what was going on" regarding them.

In January 1997, Thompson met with Steele in Baltimore regarding 3S's proposals for centralization and automation of First Union's branches. Steele wrote a follow-up letter the next day, seeking confirmation that it had been agreed that 3S would be the bank's "preferred provider of appraisal, title and settlement services" in the limited categories of direct mail and high-risk consumer loan products. Thompson did not respond to the letter in writing, but did send a copy to Clewis with a note: "Bill, Reference our trip to [Baltimore]—we didn't make any promises but would entertain their proposals—Trent." At trial, Clewis denied previously seeing that letter, but Thompson testified that he placed the letter on Clewis' desk and talked with Clewis about it.

On May 21, 1997, 3S sent what it characterized as a "draft of a performance based service agreement" to Thompson, with a cover letter from 3S Chief Operating Officer Carl D. Gent. The proposed agreement included the following clauses:

- " 'First Union National Bank hereby grants to Steele, for residential real estate secured loans, the right to perform the Traditional Services and Reports (in a minimum amount of 2,000 packages per month provided such volume exists and is not more than 50% of First Union's total volume) as listed in Exhibit A as attached hereto'.... [First Union] further agrees to permit Steele to bid on providing to [First Union] any of the Non-traditional Services and Reports, as defined in Appendix A, or any other Non-traditional Service or Report, as defined, developed or required by [First Union] during the term of this Agreement, or any renewal thereof."
- "This Agreement shall continue ... for a period of three (3) years, or until terminated in accordance with its provisions."

---

leave the bank unable to take advantage of the different strengths of various vendors.

- "This Agreement will be automatically renewed for an additional three (3) years ... unless either party notifies the other in writing of its intent not to renew."
- The agreement could only be terminated "For Cause."

This draft did not include the "best efforts language" from Steele's March 21, 1996 letter.[8]

Clewis responded by crossing out the minimum volume level of "2000 packages," and replacing it with "1,000 transactions." Steele testified that he

> was concerned about the minimum because, you know, I had stepped out there and, you know, moved, had a lot of people, lot of mouths to feed, you know, with the employees. I had taken on debt to facilitate doing this. And I said, you know, we can negotiate the minimum transactions but I still, you know, and then we put back in the best efforts because that's what had been committed and agreed to before....

Steele explained that he was disappointed that Clewis changed the minimum because "I ... went into debt, expand[ed][and] hired people[.]" He explained the purpose of the minimum:

> The concern about the minimum was that they had changed the tax law or something. You do this process for like home improvements and pools and so forth as well. So, if they changed the tax law, the purpose of the minimum was to make sure that I got transactions.... [B]ut in no way was it ever imagined that a thousand units would only be First Union volume unless they drastically changed the tax law.

Steele also said that he was unaware of the amount of First Union's total volume at the time of these negotiations.

According to Steele, the parties discussed the reduction of the transactional volume to a thousand transactions monthly:

> [Thompson and Clewis told me] that since Doug Crisp was no longer there pushing the bank or the consumer credit division that Mr. Pruitt was now involved and they didn't

---

8. Steele requested that it be reinserted, and it appears in the next draft.

think that they would be able to achieve the transaction levels that we previously in concept agreed to but the intent and commitment was still there with us, don't worry, ... we're there for you, et cetera, but they didn't think they would be able to get the document signed with a large amount of transactions in it.

Clewis also crossed out the three-year term, and replaced it with a one-year term. Steele objected to this and told Clewis that this was not acceptable and I wasn't happy and that, you know, we needed to go back to what the original commitment and promise had been and that was a long-term relationship and a partnership.

Steele also objected to the removal of the "best efforts" language. Steele thought that the "best efforts" language meant that, "as long as we performed, produced, continued doing the things that we were going to do, then they would send us all the transactions that we could handle and all that they could send to us and there would be a minimum that would allow for our protection[.]"

Steele thought this meant that First Union would send 3S approximately 85% of First Union's equity mortgage loan transactions. He and Dibble talked about doing business at that volume during their discussions prior to Dibble leaving the bank in June 1996. He did not tell Clewis or Thompson, however, that he thought "best efforts" meant 85% of the bank's transactions. He figured that they knew about his discussions with Dibble:

Mr. Clewis reaffirmed that he was very aware of what Mr. Dibble and I had discussed ... What I'm trying to explain to you, sir, is Mr. Clewis said he was aware of what Mr. Dibble had committed, promised, and represented to me. And Mr. Dibble and I, we threw some various numbers around, 70, 75%.

Dibble did not testify that he and Steele discussed a specific percentage of First Union's business.

The agreement Scott and I worked on was that with the technology Scott would have the ability to get all the

transactions. It was not an exclusive, it was not meant to be everything, but that he could handle a significant portion of volume, yes.

Dibble did not communicate to Clewis that he "had made commitments to Scott Steele that [he] expected Mr. Clewis to live up to." He thought, however, that "Bill knew pretty much what was going on."

According to Steele, he and Clewis never discussed what the best efforts clause meant:

Q: Do you have a memory sitting here today, Mr. Steele, of discussing best efforts and what it meant and it going back in the contract with Bill Clewis?

A: Sir, I never discussed what best efforts meant with Bill Clewis. I discussed the language in the service agreement.... I've never had a conversation asking Mr. Clewis, Mr. Clewis, do you know what best efforts means, sir.

\* \* \*

Q: I want to know, sir, if in fact when you discussed with Mr. Clewis putting best efforts language in this contract, if it is in fact your testimony that at that time you had no discussion with him about what the language meant.

A: The two words "best efforts," sir, I never had that discussion, what that meant. I did have discussion with Mr. Clewis with the commitment and promise that Mr. Dibble had made in the fact that the best efforts language was in the contract. Bill acknowledged that yes, that was in fact true and to put it back in there and that's exactly what I did, sir, and I didn't think any more about it because he reaffirmed what was supposed to happen all along.

### Final Version Of SA

The final version of the SA, signed on November 29, 1997, defined the partes' undertakings as follows:

## 2. RIGHT TO PERFORM SERVICES

2.1 Services. First Union hereby grants to [3S], for real estate secured loans, the right to perform the Services and Reports as listed in Exhibit A as attached hereto, as needed by First Union, for the duration of, and in accordance with this Agreement. As used herein this Agreement, "Exhibit A" refers to "Exhibit A.1" attached. Subsequent revisions to Exhibit A will bear a numerical decimal sequence and date, and the most current subsequent revision will replace any prior revision. First Union further agrees to permit [3S] to bid on providing to First Union any of the Non-Traditional Services and Reports, as defined, developed or required by First Union, during the term of this agreement. Also, [3S] shall agree to manage other Direct Mail database information for First Union, at a price per name or for the exclusive rights to perform services which shall be added to and be included in Exhibit A, provided the database information is not related to [3S's] traditional Services and Reports. **For all of the Services and Reports, as required by First Union for Residential Real Estate secured loans, First Union will use its best efforts to direct these transactions to [3S], and while this will be a non-exclusive right First Union agrees to be subject to the provisions in Section 2.1.1 of this Agreement.**

2.1.1. Minimum Volume. First Union will guarantee to [3S], beginning May 1, 1998, the right to perform at least One Thousand (1,000) Transactions per calendar month for the duration of this Agreement. If One Thousand (1,000) Transactions a calendar month on average are not delivered to [3S] to perform, for any calendar year during the Term of this Agreement, First Union will carry forward the deficit and if not made up during the Term of this Agreement, will extend the Term of this Agreement and Renewal period until the Transactional commitments are fulfilled. (Emphasis added.)

The SA also provided for the possibility that First Union might elect to give significantly more than the minimum required volume of transactions. It stated:

In the event that [First Union] wishes to increase its transaction volume above the minimum transaction levels, [3S] will be obligated to perform an additional amount of Thirty percent (30%) of the minimum transactions within the stated delivery times within this Agreement. If First Union wishes to increase the volume significantly above the Minimum Volume stated in 2.1.1 of this Agreement with the anticipation of [3S] maintaining its delivery schedules, then First Union shall notify [3S] in writing of such increase sixty days prior to such increase. [3S] upon receiving notice, will consider but not be obligated to re-negotiate the above pricing schedule.

Regarding the term of the SA, the final version of the SA provided:

#### 4. TERM AND TERMINATION

4.1 Term. This Agreement .... shall continue in full force and effect for a period of two (2) years commencing after the Ramp Up Period [defined as a period ending May 1, 1998], or until terminated in accordance with its provisions.

4.2 Renewal. This Agreement will be automatically renewable for one year terms.

4.3 Termination.... First Union may terminate this Agreement without cause after May 1, 2000, provided however, First Union provides [3S] with a one year notice of cancellation. Said notice shall not be delivered to [3S] prior to May 1, 2000.

Steele testified that the SA was the first step to the long-term relationship and partnership, which was something the parties discussed early on.

#### Implementation Of SA

After execution of the SA, 3S's volume of business from First Union increased from 1,500 transactions in the month before the SA was signed to an average exceeding 3,500 transactions per month in the spring of 1998. During the

"Ramp Up Period," defined in the SA as the time from November 29, 1997 until May 1, 1998, transactions increased dramatically, without the bank giving Steele any advance notice of the increases. Steele said that he could not tell whether he was getting most of the bank's business because he had no access to their volume or transaction list.

Steele was aware that there were other vendors providing similar services to First Union. Regarding exclusivity, Steele said, "we would have loved to have that happen but it wasn't reality.... [I]t would not be unreasonable to have a backup vendor to support First Union in case we imploded for some reason." Clewis told Steele that one of these vendors, ATM, was just a backup vendor.

The SA was profitable for 3S in the first year. The revenue from First Union was approximately $4 million, about 40–50% of 3S's gross revenue in 1998, which was about $8 million. In 1996, the year prior to the contract, 3S lost $300,000 on gross revenues of $3.8 million. In 1998, the first full year of the SA, it had a net income of $544,000 on revenues of $8.2 million. In 1999, 3S had $862,000 of profit on revenues of 8.3 million.

On February 11, 1998, Thompson, in connection with First Union's "Supplier Partnership Conference," nominated 3S for an award, writing that "3S has proven to be a true partner with First Union. Their dedication to serve our external customer is exemplified each day as they drive to exceed our expectation." He explained in the nomination form that 3S "offers a fully automated statistical property evaluation that eliminates our customers having to take time away from work to meet with an independent appraiser. This product costs less than 75% of the traditional property evaluation products[.]"

Although the SA did not limit 3S to providing its services only to First Union, there were comments made by Clewis and one other bank officer that 3S should not "go across the street." Steele interpreted these comments to mean that First Union did not want 3S providing services to their fiercest competitor, NationsBank. Although Steele told First

Union, "we're focused on your organization, we have no reason to go anywhere else," he did have discussions with both SunTrust and Wells Fargo about joint ventures with them.

## Changes At First Union And Pricing Problems

In late 1998, Clewis was transferred to a new position and was relieved of his vendor management responsibilities. Thompson had been relieved of his vendor management responsibilities earlier that year. By March 1999, First Union's three consumer credit operations had been consolidated in North Brunswick, New Jersey, under the direction of Jim Keenan and Jennifer Buzzi, who had previously managed First Fidelity's credit services, using between 20 and 25 vendors.

Buzzi soon discovered that the Charlotte vendors were charging substantially higher rates than the bank was paying in New Jersey—up to $30 more per transaction. "Appalled" at the disparity, Buzzi arranged to meet with 3S and three other vendors in Charlotte on March 3, 1999. At this meeting, Buzzi asked the vendors to decrease their prices to a reasonable level. Steele agreed to review his pricing and get back to her. On April 16, 3S responded that it would lower its pricing for property and judgment reports to $98 in specified counties, but the pricing was "contingent upon 3S maintaining our current volume levels of a minimum of 3,000 property and judgment reports per month[.]" Buzzi did not accept this proposal, because "not only did they not drop [prices] low enough[,] they wanted more volume." She indicated there was still a $20 per transaction difference in the pricing, which "would have cost the bank . . . $60,000 a month."

On April 29, Steele offered the same price on "fully underwritten Property and Judgment reports," and offered to "make available our automated valuation product" for $30, without the new minimum volume. By letter of May 4, Gent notified First Union that 3S was officially dropping to these prices. 3S, however, reserved the right to go back to its higher price of $113 "should we see a significant drop in volume." The volume for the month of April 1999 was 4,432

transactions. Buzzi told 3S that these terms were unacceptable.

## First Union's Election Not To Renew SA

On April 28, 1999, Buzzi sent a letter to Steele outlining her interpretation of the Minimum Volume requirement under the SA:

> Under Section 2.1.1 of the Agreement, First Union agreed to provide [3S] the opportunity to perform Services ... on a minimum of one thousand (1000) loans per month during the twenty-four month term of the Agreement. It is First Union's position that Section 2.1.1 contemplates that the 1000 loans per month volume is an average.... According to First Union's records, under the terms of the Agreement, [3S] has to date provided Services on at least 29,000 First Union loans.
>
> Having met its minimum obligation under terms of the Agreement, First Union will no longer be providing [3S] with the opportunity to provide Services on any additional First Union loans. While this action does not constitute a termination of the Agreement, should [3S] desire to continue to provide Services to First Union, First Union is willing to negotiate an early termination of the Agreement and the execution of a new agreement which will provide for new performance levels and price criteria.
>
> Finally, in the event that no new agreement is executed between First Union and [3S], this letter shall serve as First Union's notice pursuant to Section 4.3 of the Agreement that First Union will allow this Agreement to expire on May 1, 2000 and that no renewal of said Agreement will be honored.

Buzzi's letter was drafted by Christopher Tucci, Esq., an officer of First Union, and a corporate lawyer for First Union Corporation. Buzzi sought Tucci's advice on First Union's "specific obligations" under the SA. Tucci and Buzzi conversed about once a week regarding 3S between April 1999 and March 2000. At the time Tucci drafted the April 1999 letter,

he knew that First Union was planning to co-own a settlement services company.[9]

Steele responded to Buzzi's letter on May 3, 1999, expressing his "shock[ ]" upon receiving it. He pointed out that the SA called for " 'a minimum of 1,000 transactions per month' " and rejected her interpretation that an average of 1,000 over the entire term was sufficient. He continued:

> Without getting into the details of our extensive and lengthy negotiations with the Senior management at that time, the language was mutually negotiated as a compromise to provide First Union with what it determined to be the products and services it needed as well to ensure our volumes and work levels until May 1, 2001 . . . .
>
> We also understand your directive in your attempt to lower your fees. However, we would like First Union to state in writing that they want us to change or eliminate our current standard of underwriting as you have stated to us verbally. We have sent you a proposed pricing structure for our existing title product. We will attempt to push this down even further as we get more response from the field . . . .
>
> In closing, Jennifer, I do not think it is necessary to take a "hardball" approach in attempting to negotiate. We value the First Union relationship and have serviced First Union by delivering the highest quality products and services. We look forward to continuing our relationship and hope that First Union realizes the value that we provide. Although you may not agree with the existing Terms and Conditions of the [SA] . . ., we expect First Union to honor its current contractual obligations. We are open for further discussions to attempt to come to a mutually acceptable resolution.

Although Gent and Buzzi had a conversation on May 4 about the new pricing levels adopted by 3S, they did not discuss the April 28 letter of non-renewal. There is no evidence that Steele or anyone representing 3S said anything

---

9. We discuss these plans in more detail, *infra.*

to Buzzi or other bank officials to suggest that 3S was entitled to 85–90% of the bank's transactions.

### Overdue Invoices

The discussions about price and volume paralleled ongoing communications about certain invoices that 3S claimed had not been paid by First Union. In October 1998, 3S submitted to First Union several hundred outstanding invoices, many of which pre-dated the SA. These totaled $375,227.

First Union officials told Steele that they had not seen the invoices before and that it would take considerable time to "sort through" them and verify that they were validly connected with a loan. First Union paid $72,630 in February 1999.

Although the invoices pre-dated Buzzi's tenure in vendor management, when the invoices were only partially paid by April 1999, 3S forwarded them to Buzzi, asking her to get involved. Responding to this request, Buzzi wrote to 3S on April 24, 1999:

> I would suggest to [3S] that you identify the First Union Department and contact person that was responsible for placing these orders with 3S. The Consumer Credit Division is not going to pay for another Division's expenses.

> I will try [to] assist Steele in any way I can, but considering the age of the invoices this will take considerable time and research. Please be advised that Consumer Credit will not submit any invoice for payment unless we have both verified that our Division is responsible, backed up with sufficient 3S documentation, and also verify payment has not previously been issued.

As Buzzi suggested, 3S provided First Union again with the unpaid invoices, and the parties discussed them. By letter dated June 30, 1999, First Union offered to pay 3S $150,000 "to be applied against First Union's outstanding balance with Steele[.]" The letter said that the payment was

> being made solely for the purposes of preventing Steele from incurring undue financial hardship and in no way constitutes an agreement or admission that any such in-

voices or charges made by [3S] under the terms of the [SA] are valid or enforceable.

The letter also asked that 3S, upon written demand of First Union, immediately refund the payment, and if it did not, the bank would have the option to "exercise any rights and remedies granted [under the SA], including, but not limited to immediate termination of said Agreement." 3S did not accept the terms of this offer.

The parties finally agreed to a mechanism for resolution of their dispute. By letter agreement dated July 9, 1999,[10] the bank agreed to pay $150,000 immediately "as a good faith gesture toward a final disposition of the total balance outstanding," reserving the right to "research the validity of the Invoices." The bank also agreed to

conclude its research [on the validity of the invoices] and remit payment to [3S] on all verified invoices no later than August 31, 1999. Should First Union determine that any of the Invoices are not valid or that any of said Invoices had been previously paid, and therefore are not due and owing to [3S], First Union will pay all undisputed invoices and provide [3S], with a written notice of its determination regarding disputed invoices, together with supporting documentation, no later than August 31, 1999.[3S] shall have fifteen days from the date of such notice to present additional information in support of any such challenged invoices, to which First Union will respond within fifteen days. Any unresolved dispute concerning the validity of any such invoices shall be resolved by binding arbitration[.]

Although First Union paid the $150,000 due on July 1, it did not live up to its agreement to determine and pay the balance of the undisputed invoices by August 31, 1999. In October, First Union made an offer to settle for an additional $120,000, provided 3S released First Union from any obligations under the SA. This offer was not accepted by 3S.

---

**10.** The letter agreement was dated July 9, 1999, but called for payment on or about July 1, 1999.

Final resolution of this dispute was not made until November 5, 1999, when the parties entered an "Agreement and Release," in which First Union agreed to pay $245,000 within one day, and 3S released First Union from claims relating to the disputed invoices. This sum was paid.

### Declining Volume For 3S

Although the number of transactions First Union sent to 3S exceeded 2,000 per month from March 1998 through July 1999, they started to decline in August 1999 and fell below the agreed Minimum Volume in October 1999. Steele's expert witness introduced a chart showing the actual volume of transactions referred to 3S from First Union, the bank's actual volume, and the amount 3S could have handled from January 1998—February 2003. This chart is set forth in relevant part below:

**Steele's Actual Title and Appraisal Count vs.**
**Steele's Projected Capacity with growth at 1000 per month (Jan–May 98),**
**1500 per month initially (Jun–Oct 98) and**
**1250 per month until capacity caps off at 60,000**

| | Steele Actual | Steele Projected Capacity Totals Appraisals & Titles | FU Actual Total Appraisal & Titles | Min Steele Projected and FU Actual |
|---|---|---|---|---|
| Jan-98 | 664 | 3,000 | 1,056 | 1,056 |
| Feb-98 | 1,078 | 4,000 | 3,275 | 3,275 |
| Mar-98 | 2,338 | 5,000 | 5,494 | 5,000 |
| Apr-98 | 3,039 | 6,000 | 11,168 | 6,000 |
| May-98 | 5,235 | 7,000 | 11,277 | 7,000 |
| Jun-98 | 3,641 | 8,500 | 11,959 | 8,500 |
| Jul-98 | 2,792 | 10,000 | 13,210 | 10,000 |
| Aug-98 | 2,321 | 11,500 | 13,751 | 11,500 |
| Sep-98 | 2,091 | 13,000 | 13,993 | 13,000 |
| Oct-98 | 3,337 | 14,500 | 18,148 | 14,500 |
| Nov-98 | 3,678 | 15,750 | 24,716 | 15,750 |
| Dec-98 | 3,383 | 17,000 | 31,084 | 17,000 |
| **Totals** | **33,597** | **115,250** | **159,131** | **112,581** |
| Jan-99 | 2,159 | 18,250 | 28,939 | 18,250 |
| Feb-99 | 2,957 | 19,500 | 37,342 | 19,500 |
| Mar-99 | 4,307 | 20,750 | 37,022 | 20,750 |
| Apr-99 | 4,432 | 22,000 | 41,436 | 22,000 |
| May-99 | 3,192 | 23,250 | 31,771 | 23,250 |

| | | | |
|---|---|---|---|
| Jun-99 | 2,653 | 24,500 | 36,058 | 24,500 |
| Jul-99 | 2,488 | 25,750 | 41,050 | 25,750 |
| Aug-99 | 1,907 | 27,000 | 42,741 | 27,000 |
| Sep-99 | 1,139 | 28,250 | 40,598 | 28,250 |
| Oct-99 | 874 | 29,500 | 35,042 | 29,500 |
| Nov-99 | 780 | 30,750 | 28,033 | 28,033 |
| Dec-99 | 793 | 32,000 | 15,242 | 15,242 |
| **Totals** | **27,681** | **301,500** | **415,274** | **282,025** |
| Jan-00 | 838 | 33,250 | 29,961 | 29,961 |
| Feb-00 | 772 | 34,500 | 34,911 | 34,500 |
| Mar-00 | 992 | 35,750 | 40,673 | 35,750 |
| Apr-00 | 734 | 37,000 | 33,617 | 33,617 |
| May-00 | 417 | 38,250 | 34,497 | 34,497 |
| Jun-00 | 342 | 39,500 | 33,752 | 33,752 |
| Jul-00 | 0 | 40,750 | 50,322 | 40,750 |
| Aug-00 | 0 | 42,000 | 40,251 | 40,251 |
| Sep-00 | 0 | 43,250 | 31,956 | 31,956 |
| Oct-00 | 0 | 44,500 | 34,748 | 34,748 |
| Nov-00 | 0 | 45,750 | 31,352 | 31,352 |
| Dec-00 | 0 | 47,000 | 23,888 | 23,888 |
| **Totals** | **4,095** | **481,500** | **419,928** | **405,022** |
| Jan-01 | 0 | 48,250 | 38,621 | 38,621 |
| Feb-01 | 0 | 49,500 | 37,114 | 37,114 |
| Mar-01 | 0 | 50,750 | 46,626 | 46,626 |
| Apr-01 | 0 | 52,000 | 45,040 | 45,040 |
| May-01 | 0 | 53,250 | 46,622 | 46,622 |
| Jun-01 | 0 | 54,500 | 42,289 | 42,289 |
| Jul-01 | 0 | 55,750 | 41,213 | 41,213 |
| Aug-01 | 0 | 57,000 | 42,504 | 42,504 |
| Sep-01 | 0 | 58,250 | 43,779 | 43,779 |
| Oct-01 | 0 | 59,500 | 45,092 | 45,092 |
| Nov-01 | 0 | 60,000 | 46,445 | 46,445 |
| Dec-01 | 0 | 60,000 | 47,838 | 47,838 |
| **Totals** | **0** | **658,750** | **523,182** | **523,182** |

Steele wrote to Buzzi on September 22, 1999:

We continue to see a dramatic decrease in transaction volume during the last 90 days. Given this fact, and pursuant to Carl Gent's letter of May 4, 1999, please be advised that unless we begin to receive a flow of transactions similar to levels of earlier this year, we will return to a rate of $120.00 for title reports, per the service agreement.... When transaction volume returns to the previous levels we would welcome the opportunity to re-visit this issue with you.

During late fall 1999 and January 2000, Steele attempted to coordinate further discussions with First Union about the

decrease in volume, without success. On February 8, 2000, Steele wrote a long letter to First Union summarizing the history of the relationship, including the problems with payment of invoices and the declining volume of business.

> [3S] has historically enjoyed the highest approval from First Union processors in matters of quality, promptness, and customer support. The only issue appears to be price.... My goal has always been to convene a meeting at which we could find a positive business solution.

In March 2000, First Union scheduled a meeting with Steele to see what could be worked out about the SA. In anticipation of this meeting, Steele prepared a presentation for First Union. In this presentation, Steele characterized the 3S/First Union relationship as "[t]remendous until consolidation in New Jersey where unpaid invoices, service agreement and pricing seems to have created a relationship issue." Under the heading, "Summary of Current Issues," Steele wrote:

> Current contract provides for:
>
> - Minimum 1000 orders per month (we are currently receiving less).
> - Pricing at $120 per P & J: we agreed to lower our pricing per our May, 1999 letter—instead volume dramatically decreased; subsequently we notified [First Union] of our intentions with no response. Until an alternative agreement is reached, our original contract must be honored.
> - Payment terms are net 15 days from date of invoice ( [First Union] AP currently holds invoices from date they receive approved invoice even if invoice is 11 months overdue).
>
> We suggest that we agree to disagree at this point and talk about alternative arrangements.

In none of his correspondence with First Union did Steele ever mention that First Union was obligated to send any specific percentage of its loan business to 3S, or assert any volume requirement under the SA except the Minimum Volume.

Four First Union vice presidents and Tucci attended the March 13, 2000 meeting with Steele. According to Steele, First Union Senior Vice President Kirk Bare, who was by then heading the Consumer Credit Division, told him that "he would pay the differential.... He also stated that, you know, that for us to continue doing business, we would have to tear up the agreement[.]" When Steele responded that Bare's approach was "an extremely heavy-handed way of doing business," Bare asserted: " 'I can be heavy-handed. I'm First Union.' " Buzzi's notes from the meeting confirmed that Bare agreed to pay all outstanding invoices only if Steele would "send a letter terminating the contract."

After the meeting, on April 19, 2000, 3S sent a letter to First Union indicating that "we construe the agreement to provide for at least 12,000 more orders, plus the makeup of any monthly volume shortages before it has been satisfied." 3S also proposed that it "substantively alter its product mix and pricing for First Union in such a way that we can operate on a working basis that would enable us to shelve the written agreement, and let it expire according to its own terms." The parties failed to reach agreement on continuing their relationship, and referrals of business to 3S ceased altogether after June 2000.

### First Union's Plans For Its Own Settlement Services Company

In 1993 or 1994, prior to 3S's first presentation to First Union, First Union internally discussed creating its own settlement services company to address the problem that its thousands of individual branches were decentralized and that "the branches performed all the functions of acquiring title, appraisal at the branch level. They followed up, tracked it, and did everything necessary to make that happen. And ... it was a nightmare and mess." The branches were "drowning in paper." Margaret England, a regulatory compliance attorney working for First Union Mortgage Company (FUMC) Senior Vice President Jim Maynor, was tracking legislation

that might affect First Union's plan to establish its own settlement service business.

During these same years, First Union also considered the alternative of buying a settlement services company. As indicated earlier, the bank's early discussions with Steele included plans for First Union to purchase an equity interest in 3S. Although Steele included some proposals for such purchase in some of his written proposals to First Union, they were not part of the final SA.

Three years later, on November 14, 1997, a date two weeks before it signed the SA, First Union issued a strategic plan in which it continued the goal of centralizing and automating the home equity loan process. In June 1998, the Comptroller of the Currency issued a letter to Mellon Bank, N.A. advising that it was permitted to enter into a joint venture with a national vendor to provide centralized services for Mellon's residential loans—the same service that 3S provided for First Union.

Two months later, England distributed a memorandum suggesting that FUMC, a First Union subsidiary that made home mortgage loans, work with two other First Union subsidiaries, First Union Home Equity Bank and The Money Store, to explore the possibility of forming a joint venture with an outside company to manage settlement services. The August 12, 1998 memo noted that FUMC's "major mortgage banking competitors" were setting up similar ventures.

In the fall of 1998, First Union issued a Request For Proposals ("RFP") to a number of vendors, seeking assistance in establishing a subsidiary and providing automation and management services.[11] Eight companies bid on the project, including ValuAmerica, which projected a "five-year aggregate revenue of approximately $2.4 billion and a five-year aggre-

---

11. First Union did not send the RFP to 3S until RFPs were sent to eleven other companies.

gate profit of $1.1 billion." Although 3S responded to the RFP, it was not selected as a finalist. When Steele learned that 3S was not selected, he called England on March 16 and reminded her that 3S had the SA. The next day he wrote to her offering ways in which 3S could address the problems First Union had with its proposal.

First Union chose ValuAmerica, and entered an agreement for ValuAmerica to provide services, and allowing First Union to buy out ValuAmerica for approximately $30 million. The new settlement services company, known as "GreenLink," began doing business on June 1, 2000. Within a year, First Union bought out ValuAmerica and became the sole owner of a hugely profitable settlement services company.

## Jury Verdict

At the end of the trial, the jury found that First Union breached the SA, that it did not give proper notice of non-renewal or termination, and that the SA ended on May 1, 2001. It awarded 3S $21,240,614 in damages for breach for the period from January 1, 1998 to April 30, 2000. It awarded an additional $16,235,728 in damages for the period May 1, 2000 to April 30, 2001. It also found that First Union fraudulently induced 3S to enter the SA, and awarded compensatory damages of $39,476,342. In a separate verdict the following day, it awarded punitive damages for the fraud in the amount of $200,000,000. Finding that the $37,476,342 compensatory damages for breach of contract duplicated the $39,476,342 compensatory damages for fraudulent inducement, the trial court entered judgment against First Union for compensatory damages in the amount of $39,476,342. It entered judgment against First Union for $200,000,000 in punitive damages.

First Union filed motions for a new trial, for judgment notwithstanding the verdict, and for remittitur, all of which were denied by the trial court. First Union filed a timely appeal from these verdicts.

**134**

## DISCUSSION

## I.

## The Facts Proven Were Not Sufficient To Establish Fraud

█ The elements for a fraud action in Maryland were clearly summarized in a leading fraud case, *Martens Chevrolet, Inc. v. Seney*, 292 Md. 328, 439 A.2d 534 (1982):

The requirements for a successful deceit suit, as they have evolved in Maryland, were stated by this court ... over fifty years ago, and they remain the same to this day:

To entitle the plaintiff to recover it must be shown: (1) that the representation made is false; (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4) that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting from such fraudulent misrepresentation.

*Id.* at 333, 439 A.2d 534 (citation omitted). The plaintiff must prove these elements by "clear and convincing evidence." *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998).

█ Although a cause of action for fraud may not rest on a statement about future events, a person may commit fraud if he or she enters an agreement to do something, without the present intention of performing:

[W]here one person induces another to part with his money or property by means of a promise which he makes with the intention of not performing it, he is guilty of actionable fraud. In such a case fraud is committed by false pretense and deliberate deception. There is a *prima facie* presump-

tion of honesty and fairness in the dealings of mankind, and hence when one person makes a promise to another as an inducement for a change of position, the promisee has the right to assume that the promisor has an existing intention to fulfill his promise. The existing intention of a party at the time of contracting is a matter of fact, and may be material to the validity of the contract.

*Appel v. Hupfield*, 198 Md. 374, 382, 84 A.2d 94 (1951). It is this type of fraud that 3S asserted against First Union.

■ In this appeal, we are called upon to decide whether "evidence when viewed in its entirety does not establish, clearly and convincingly, a prima facie case of fraud on the part of" First Union. *See Wrexham*, 350 Md. at 715, 715 A.2d 188 (reversing jury verdict finding fraudulent inducement on grounds that circumstantial evidence shown was not sufficient to establish fraudulent intent).[12] In doing so, we must "assume the truth of all credible evidence and all inferences of fact reasonably [deducible] from the evidence supporting [3S]." *Nationwide Mut. Fire Ins. Co. v. Tufts*, 118 Md.App. 180, 190, 702 A.2d 422 (1997). We resolve all conflicts in evidence in favor of 3S. *See Jacobs v. Flynn*, 131 Md.App. 342, 353, 749 A.2d 174, *cert. denied sub nom. Kishel v. Jacobs*, 359 Md. 669, 755 A.2d 1140 (2000). "If the record discloses any legally relevant and competent evidence, however slight, from which the jury could rationally find as it did, we must affirm the denial of the motion [for judgment notwithstanding

---

12. The quoted language suggests that the Court of Appeals considers the burden of persuasion in reviewing a fraud verdict (*i.e.*, "clear and convincing, as compared to 'preponderance of the evidence' "). To our knowledge, the Court has never held that evidence in a case was sufficient to meet the preponderance standard, but not the clear and convincing standard. *Cf. Atl. Richfield Co. v. Sybert*, 295 Md. 347, 365, 456 A.2d 20 (1983)(evidence was clear and convincing). We have held that considering the burden of persuasion is not an appellate function. *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md.App. 18, 55, 818 A.2d 1159, *cert. granted*, 376 Md. 49, 827 A.2d 112 (2003). Given uncertainty on this issue, we do not rest our decision on the requirement that there be clear and convincing evidence to establish fraudulent intent. *See Sass v. Andrew*, 152 Md.App. 406, 433–43, 832 A.2d 247 (2003).

the verdict]." *Id.* at 353, 749 A.2d 174. Although 3S proved hard-nosed business dealings on the part of First Union, leading up to a deliberate and substantial breach of contract, we conclude that the evidence, when viewed in its entirety, falls short of proving fraud in the inducement.

In examining the First Union representations that 3S relies upon to prove fraud, we classify them in three categories. The first category consists of the written promise of First Union contained in the SA that we referred to as the "best efforts" clause. As we explain further below, First Union's intentions regarding the "best efforts" clause were not sufficient to show the scienter necessary to prove fraudulent intent not to perform, largely because this clause was ambiguous, and the parties did not discuss what it meant.

The second category consists of representations that could not be reasonably relied on in this commercial transaction because they contradict the express terms of the SA. The third category includes representations that are so broad and vague that they are not actionable misrepresentations, and fall within the category of "puffing." As shall be shown in the discussion that follows, sometimes these categories overlap.

### The "Best Efforts" Clause

3S argues that the "best efforts" clause meant that First Union was promising to give it 75–85% of the title and appraisal work needed for all home equity loans made by the bank. The trial court found that the "best efforts" clause at least meant that First Union promised to give 3S the settlement services on more than 50% of their loans. In support of their view that the necessary fraudulent intent was proven, both 3S and the trial court point to a statement made by Clewis at trial that he never intended to give 3S more than 50% of First Union's business because it was not prudent for the bank to "put all our eggs in one basket."

"Maryland has adopted the overwhelming majority rule of the American courts in holding that fraud may be predicated on promises made with a present intention not to perform

them." *Tufts v. Poore,* 219 Md. 1, 11, 147 A.2d 717 (1959). To establish a claim for fraudulent inducement based on First Union's failure to intend to give 50% or more of its business to 3S, however, requires a showing first that First Union knew that the SA clearly required that level of performance by First Union. Fraudulent intent not to fulfill a performance requirement that First Union never undertook, does not support a cause of action for fraudulent inducement.

It must be remembered, moreover, that 3S's fraud claim was based on fraudulent inducement to **enter the SA.** That is what Steele stated. He said that Clewis never told him the SA was a two-year agreement limited to 1,000 transactions per month, and that if he had, Steele would not have signed the contract. Rather, he "would have asked [Clewis] to honor the commitments that he and his predecessors had made to me."

Most importantly, that is what the jury was asked to find, and did find, in answer to written interrogatories on the verdict sheet. On the verdict sheet, with respect to the fraud count, the jury was asked and answered the following:

2. **Do you find by clear and convincing evidence** that [First Union] fraudulently induced [3S] to **enter into the [SA]?**

[Yes]

**If you answered "Yes" to Question 2,** please answer Question 2(a). . . .

2(a) **Based on a preponderance of the evidence,** how much, if any, do you award to [3S] for compensatory damages for **Fraud in the Inducement?**

$39,476,342.00

Therefore, 3S needed to prove fraudulent intent with respect to the obligations undertaken in the SA.

Our analysis of the whether First Union committed fraud by signing the SA and its "best efforts" clause without intending to perform its obligations thereunder starts with close examination of the clause itself, and how it fits within the entire contract. Referring to the language of section 2.1 that we

quoted previously, we observe that First Union promised that, "[f]or all the of Services and Reports, as required by First Union for Residential Real Estate secured loans, First Union will use its best efforts to direct these transactions to [3S], and while this will be a non-exclusive right First Union agrees to be subject to the provisions in Section 2.1.1 of this Agreement." Section 2.1.1 establishes a Minimum Volume of transactions that First Union guaranteed to 3S.

The language in sections 2.1 and 2.1.1 is internally inconsistent. The isolated phrase, "best efforts to direct these transactions to [3S]," could be interpreted to mean that the parties intend that, unless there are laws or circumstances precluding First Union from sending all such transactions to 3S, the bank will do so. But the parties also agreed that this is a "**non-exclusive right[.]**" Significantly, this language removes any doubt about whether First Union could make referrals to other vendors, and even suggests that there may be other vendors who can share the right to receive First Union's "best efforts" to refer them business. Thus, one reasonable reading is that 3S had a right to receive referrals on at least as favorable a basis as offered to comparable vendors. Alternatively, it may be read to mean that there are other vendors to whom First Union may refer business, without necessarily making "best efforts" toward them.

There is no definition of "best efforts" in the SA. Nor have we found a definitive meaning under statute or case law. Rather, "best efforts" is a term "which necessarily takes its meaning from the circumstances." *Bloor v. Falstaff Brewing Corp.*, 454 F.Supp. 258, 266 (S.D.N.Y.1978), *aff'd,* 601 F.2d 609 (2d Cir.1979); *see also Triple–A Baseball Club Assocs. v. Northeastern Baseball, Inc.*, 832 F.2d 214, 225 (1 st Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988)(best efforts "cannot be defined in terms of a fixed formula ... [but] varies with the facts and the field of law involved"); *Trimed, Inc. v. Sherwood Med. Co.*, 772 F.Supp. 879, 885 (D.Md.1991)(quoting *Bloor); Polyglycoat Corp. v. C.P.C. Distrib., Inc.*, 534 F.Supp. 200, 203

(S.D.N.Y.1982)(quoting *Bloor* ); *Victor P. Goldberg, Great Contracts Cases: In Search of Best Efforts: Reinterpreting Bloor v. Falstaff,* 4 St. Louis L.J. 1465, 1465 (2000)("best efforts" can only be defined contextually).[13] Thus, although contract interpretation is generally a question of law, a factual determination may be required as to what is deemed to be "best efforts." *See Mor–Cor Packaging Prod., Inc. v. Innovative Packaging Corp.,* 328 F.3d 331, 335–36, 2003 U.S.App. LEXIS 8288, *11–12 (7th Cir.2003)(treating as question of fact issue of whether exclusive product distributor's acquisition of company competing with potential purchasers of product constituted breach of promise to use "best efforts" to sell manufacturer's product); *Trimed,* 772 F.Supp. at 885 ("Although contract interpretation is generally a question of law, this contract required a factual determination as to what is deemed to be 'best efforts' ").

In a 1984 law review article, *On Trying To Keep One's Promises: The Duty of Best Efforts In Contract Law,* Professor Farnsworth observed:

> Best efforts is infrequently mentioned in the [Uniform Commercial] Code and the *Restatement (Second) of Contracts* and ... has been generally neglected in the law reviews.... Because courts sometimes confuse the standard of best efforts with that of good faith, it will be well ... to make plain the distinction between the two standards. Good faith is a standard that has honesty and fairness at its core and that is imposed on every party to a contract. Best efforts is a standard that has diligence as its essence and is imposed only on those contracting parties that have undertaken such performance.

*E. Allan Farnsworth, on Trying to Keep One's Promises: The Duty of Best Efforts in Contract Law,* 46 U. Pitt. L.Rev. 1, 7–

---

**13.** A party's entering a contractual commitment to use "best efforts" without intent to perform can be the basis of an action for fraud. *See Travel Comm., Inc. v. Pan Am. World Airways, Inc.,* 91 Md.App. 123, 179, 603 A.2d 1301, *cert. denied,* 327 Md. 525, 610 A.2d 797 (1992).

8 (1984)(footnotes omitted). Farnsworth answered the question, "how is this standard of diligence to be set?"

> Courts have generally responded in two ways. The first is to imagine the promisor and the promisee united in a single person and to ask what efforts a reasonable person in that situation would exert on his or her own behalf. The second is to imagine a third person to be in the promisor's place to ask what efforts a reasonable person in that situation would exert.

*Id.* at 8 (footnotes omitted). *See also* E. Allan Farnsworth, *Farnsworth on Contracts* § 7.17, at 350–53; § 7.17c, at 381–88 (2d ed.1998)(addressing various interpretations of best efforts clauses).

The Seventh Circuit has held that "best efforts" can mean the efforts the promisor has used in similar contracts where the adequacy of its efforts was not questioned. *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1373 (7th Cir.1990). The First Circuit has held that "best efforts" in a contract "to promote worldwide licensing and use" of the contracting party's product required "active exploitation in good faith." *Western Geophysical Co. of Am., Inc. v. Bolt Assocs., Inc.*, 584 F.2d 1164, 1171 (2d Cir.1978).

■ A promise to use "best efforts" does not necessarily mean that the promisor is required to give all of its efforts toward assisting or promoting the promisee's interests or product, or that the promisor is prohibited from promoting competing products. *See Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publ'g Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, 144–45 (1972), *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972)(licensees who agree to make "best efforts" to promote licensor's product are not restricted in promoting competing products).[14] *See also*

---

14. For an example of a best efforts clause where the promisor makes best efforts to sell property, while it is also selling competing property, see *Brooks v. Euclid Sys. Corp.*, 151 Md.App. 487, 502–03, 827 A.2d 887, *cert. denied*, 377 Md. 276, 833 A.2d 31 (2003)(stockbroker entered "best

*Bloor,* 601 F.2d at 614 (Falstaff Brewing could market its own beers and still fulfill promise to make best efforts to promote and market Ballentine beer); *Farnsworth on Contracts, Supra,* § 7.17c, at 388 ("courts agree ... that a duty of best efforts does not of itself impose a duty of exclusive dealing, although it should be open to the promisee to show that the parties understood the term to include such a duty").

We are not persuaded that merely signing the best efforts clause necessarily means that First Union officials knew that they were contractually obligated to make more than 50% of their referrals to 3S. Although the clause uses the term "For all of the Services and Reports, as required by First Union for Residential Real Estate secured loans," it explicitly states that 3S's "right" shall be "non-exclusive." Thus, First Union could reasonably expect that it would be referring a meaningful amount of business to other vendors.

Furthermore, the term "Services" itself creates an ambiguity as to what was intended. "Services" is defined elsewhere in the SA as "those functions, documents, or other data provided by Steele to First Union National Bank **in response to a request** for information on a particular real property." (Emphasis added.) If "all Services and Reports as required by First Union" means simply those services given "in response to a request" from the bank, then the bank would have nothing more than an obligation to act in good faith in requesting some services. Thus, incorporating the definition of "Services" into section 2.1, 3S reasonably could believe that it was within its discretion how much volume it requested.

In interpreting a contract, courts will review the contract "as a whole to determine the parties' intentions." *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617 (1995). Other clauses in the SA, and the history of the negotiations suggest that the parties did not intend that First Union give more than 50% of its business to 3S. The titling of section

---

efforts selling agreements" with issuers of securities; interpretation of best efforts clause not at issue).

2.1.1, "Minimum Volume," indicates that the only specific guarantee as to volume is contained therein. That section provides only that "First Union will guarantee to [3S], beginning May 1, 1998, the right to perform at least One Thousand (1,000) Transactions per calendar month for the duration of this Agreement."

Exhibit A.1, expressly incorporated into section 2.1, also indicates that, so long as First Union remained above the section 2.1 Minimum Volume levels, it was within First Union's **discretion to decide what any additional volume would be:**

> **In the event** that [First Union] **wishes to increase its transaction volume above the minimum transaction levels,** [3S] will be obligated to perform an additional amount of Thirty percent (30%) of the minimum transactions within the stated delivery times within this Agreement. If First Union wishes to increase the volume significantly above the Minimum Volume stated in 2.1.1 of this Agreement with the anticipation of [3S] maintaining its delivery schedules [as specified in the SA], then First Union shall notify [3S] in writing of such increase sixty days prior to such increase. [3S], upon receiving notice, will consider but not be obligated to re-negotiate the above pricing schedule. (Emphasis added.)

We shall refer to this clause as the "130% Clause."

In short, the SA was not at all clear that, in exerting its "best efforts," First Union was required to give 3S 50%, 75%, or any other specific percentage of business. Although the best efforts clause referred to "all of the Services and Reports," the term "Services" was ambiguous, the clause was qualified as non-exclusive, and the 130% Clause suggested that, above the Minimum Volume, First Union had the discretion to decide how much business to refer.

Moreover, there is no evidence that Clewis or Thompson made representations to Steele to suggest that the "best efforts" clause was intended to guarantee more than 50% of the bank's volume. Steele admitted that he never discussed

with Clewis or Thompson the meaning of the "best efforts" clause. He never told either Clewis or Thompson that he thought that it meant 3S would receive 75–85% of the bank's business, 50% of the bank's business, or any other specific percentage of business. Reviewing the language of the SA, and in the absence of any discussion indicating that the "best efforts" clause meant that 50% was required, we cannot sustain a finding that Clewis **fraudulently** intended not to perform, simply because he never intended to refer more than 50% of the bank's business.

3S does not contend that Dibble possessed fraudulent intent. Rather, 3S argues that Steele and Dibble had conversations that would support his interpretation that the SA meant he would get 50% or more of First Union's business, that Dibble informed Clewis about these conversations, and that Clewis never intended to give more than 50% of the bank's business. Clewis had told Steele that he "was aware of what Mr. Dibble had committed, promised, and represented to me[,]" and that 3S remained First Union's vendor of choice— "nothing had changed." The conversations Steele said he had with Dibble were far from concrete, however.

Steele testified that Dibble said that if Steele delivered on his promises, 3S "could be the beneficiary of all the transactions that they could send to us." Similarly, Steele said that he and Dibble discussed that "best efforts" meant "that he could send all the transactions that he could and that I could handle." This statement is vague in itself. All the transactions First Union "could" send might easily mean those that it could send after taking into account First Union's need, as Clewis explained, to maintain multiple vendors to get good service, to maintain competitive pricing, and to safeguard against natural and technological disasters. A promise to use best efforts does not require that a party disregard its own interests. *See NCNB Nat'l Bank of N.C. v. Bridgewater Steam Power Co.*, 740 F.Supp. 1140, 1152 (W.D.N.C. 1990)("The requirement that a party use its best efforts necessarily does not prevent the party from giving reasonable

consideration to its own interests")(citing *Bloor*, 454 F.Supp. at 267).

The only thing Steele said about a specific percentage was that he and Dibble, well over a year before the SA was signed, had "thr[own] some various numbers around, 70, 75%." But in March 1996, even before Dibble's departure from First Union, Dibble had rejected 3S's September 1995 proposal that the bank guarantee 70%.[15] To the contrary, in March 1996, First Union circulated a draft that had no minimum volume requirement and no exclusivity clause. Moreover, Steele did not testify that he and Dibble ever **agreed** that 75% or any particular percentage of the bank's business would be guaranteed in the contract. He also acknowledged that Thompson and Clewis told him, with respect to the Minimum Volume being reduced, that

> since Doug Crisp was no longer there pushing the bank or the consumer credit division that Mr. Pruitt was now involved and they didn't think that they would be able to achieve the transaction levels that we previously in concept agreed to but the intent and commitment was still there with us, don't worry ... we're there for you, et cetera, but they didn't think they would be able to get the document signed with a large amount of transactions in it.

Nor did Dibble say the bank had promised at least 50% of their transactions. Dibble testified that he wanted to put Steele into the position where his computerized appraisal and title service could be directly accessed by all the branches. We examine that testimony below.

Dibble first explained that when he was working with Steele to prepare to perform title and appraisal services for the direct mail project, it was necessary for a significant number of users to access the computer system at one time because

---

**15.** It is undisputed that Steele's second draft contract, sent in September 1995, proposed that 3S receive the greater of: 70% of First Union's transactions, or an average of 2,500 transactions per month for the first year, and 7,500 transactions per month thereafter. This proposal was not accepted by First Union.

the bank had 2,000 branches, with one to three lenders in a branch. This meant that the computers needed to have the capacity to handle up to 5,000 or 6,000 users at one time. He indicated that at the completion of the ATAPS pilot project, this goal was accomplished, and approximately 2,000 branches could log onto 3S.

When asked about the "best efforts" clause, Dibble said nothing about guaranteeing 50% or more:

Q: Was it your intent, Mr. Dibble, to in any way limit the amount of transactions that were to go to 3S other than limitations by law?

A: Limitations by law and stuff that was beyond my authority. I couldn't commit branches to it, but I wasn't intentionally trying to limit.

Q: Was it your intent to send 3S all that 3S could handle and all that FU could generate except by limitations by law?

A: It was my intent **to create a mechanism to where Scott—we could access Scott's system, get to appraisals, [S]cott could—and with certain ramp ups in service levels, Scott could handle the volume that was coming through those branches, whatever that would look like.** (Emphasis added.)

Dibble also was asked about his intent with respect to the "best efforts" clause in the April 16, 1996 draft of the SA.

Q: What did you intend the term "best efforts" to mean with respect to this relationship?

A: That once we had a connection between Scott and First Union, that would be the best efforts to direct the transactions believing that the branches would take advantage of an ability to close loans faster and/or gain appraisals.

And for those that chose not to because they have somebody down the street to do business, obviously this would give them the ability to do that.

Q: But you meant "best efforts" to include sending as many transactions within the entire 2,000 branch [First Union] footprint as possible or that Scott could handle?

A: I couldn't direct them, but my belief was that Scott could reasonably assume to get a significant portion of the volume. And my intent was not to limit him.... **The functionality would be there for him to get that.** (Emphasis added.)

Dibble also said, when asked about his conceptual agreement with Steele:

[T]he agreement Scott and I worked on was that with the technology Scott would have the ability to get all the transactions. It was not an exclusive, it was not meant to be everything, but that he could handle a significant portion of volume, yes.

Thus, although Dibble thought that 3S might get more than 50% of the transactions because of his technology, nowhere did Dibble say that he agreed to commit the bank to this amount. Nor did Dibble say that he told Steele that he had authority to commit the bank to such an amount.

Even if the testimony of Steele and Dibble was sufficient to allow the jury to infer that Clewis knew that Steele and Dibble had discussed 3S getting 75% of the bank's business, we do not think that the SA was sufficiently clear to establish that Clewis, in entering the SA on behalf of First Union, knew that he was making this kind of commitment on the part of the bank. Yet proof that Clewis **understood** that he was **committing** to give more than 50% of the bank's business to 3S is essential if proof of his fraudulent intent is predicated on his trial testimony, that he never **intended** to give more than 50%.

Let us be clear. We are not saying that, as a contractual matter, the "best efforts" clause had no meaning, and that the only enforceable promise by First Union was the Minimum Volume. As we suggested above, and we expand on in section II, we think, in assessing 3S's contract claim, the jury could have decided that the best efforts clause imposed some requirement on First Union to diligently refer a significant amount of business to 3S, even if it did not require First Union to refer a specifically agreed upon percentage of its business.

■ A cause of action for fraud, however, has a strict requirement of scienter. " '[R]ecovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive.' " *Wrexham*, 350 Md. at 704, 715 A.2d 188 (quoting *Ellerin v. Fairfax Sav.*, 337 Md. 216, 230, 652 A.2d 1117 (1995)). *See also Miller v. Fairchild Indus., Inc.*, 97 Md.App. 324, 342, 629 A.2d 1293, *cert. denied*, 333 Md. 172, 634 A.2d 46 (1993)("Proof of scienter is critical to a successful deceit action"). As with the other elements of fraud, scienter must be proven by "clear and convincing evidence." *See Wrexham*, 350 Md. at 704, 715 A.2d 188.

Because there was no discussion between the parties that "best efforts" required First Union to send 3S more than 50% of its business, and because one reasonable reading of the contract is that no specific transaction volume, other than the Minimum Volume, was guaranteed, the jury could not reasonably infer this fraudulent intent **simply** from Clewis' saying that he never intended to refer 3S more than 50%. So we must examine whether there is other evidence of fraudulent intent.

### Motive For Fraud

■ First, we look at 3S's evidence regarding First Union's possible motives for getting 3S to enter the SA, even though First Union had no intent to perform its obligations under that agreement. 3S quotes the trial court's Memorandum accompanying its order denying a new trial and JNOV.

> " '[First Union] wanted and needed [3S] to centralize and automate its home equity loan settlement services;'that in order to induce [3S] to assist [First Union] in [doing so] ... [First Union] represented to [3S] that [3S] would be its long term partner for all of the transactions that [First Union] could send to [3S] and that [3S] could handle, with a written contract being the first step in the relationship ...; 'that [First Union's] ... motivation in its scheme was to own its own settlement services company[.]' "

3S contends that there is evidence that this "scheme" was in place because a First Union affiliate had discussions in 1993–1994 about forming its own settlement services company, and

because First Union thereafter continued to track regulatory developments regarding the legality of such a venture.

A possible motive for committing a fraud, however, does not prove fraudulent intent. *Cf. Travel Comm., Inc. v. Pan Am. Airways, Inc.*, 91 Md.App. 123, 178–79, 603 A.2d 1301, *cert. denied*, 327 Md. 525, 610 A.2d 797 (1992)(general plan to change corporate direction in manner potentially inconsistent with contractual commitment did not suffice to show fraudulent intent not to abide by contract at time of execution). In *Miller v. Fairchild Indus.*, we held that a speech by the chief executive of an aircraft manufacturing company to plant employees indicating that the company was not planning to close the plant, and they could continue to make major purchases without fear of job loss, was not fraud, absent proof that the executive knew, at the time of the speech, that the plant was going to lose its major contract with Boeing. *See Miller*, 97 Md.App. at 343–45, 629 A.2d 1293. We held that no fraud was shown, even though, two months before the speech, the executive knew that the Boeing contract was in jeopardy, and had made a speech to a local Chamber of Commerce that the future of the plant was uncertain. *See id.* We see the evidence of First Union's discussions of acquiring a settlement services company in 1993–1994, three to four years before it contracted with 3S, as no more incriminating than the evidence that Fairchild knew a plant closing was likely.

## 3S Does Not Claim Misappropriation Of Its Trade Secrets

It is crucial to remember, in this context, that, as 3S acknowledged in its brief and several times at trial, its claim against First Union was not a claim for misappropriation of trade secrets. The strategic decision to disclaim any claim for misappropriation of trade secrets apparently was made by 3S to avoid First Union's contention that its claim for fraud was pre-empted by the Maryland Uniform Trade Secrets Act.[16]

---

**16.** 3S chose not to bring its action under the Maryland Uniform Trade Secrets Act ("MUTSA"), *codified at* Md.Code (1975, 2002 Repl.Vol.,

## Other Evidence Of Fraudulent Intent Not To Perform The Best Efforts Clause

■■■■ 3S also urges that we can find fraudulent intent in First Union's immediate breach of the contract, without a change in circumstances, together with its subsequent conduct. The Court of Appeals has educated us on the limits on such an exercise:

> A fraudulent pre-existing intent not to perform a promise made cannot be inferred from the failure to perform the promise alone. But, it may be considered with the subsequent conduct of the promisor and the other circumstances surrounding the transaction in sustaining such an inference. And it has been stated that under certain conditions, a failure or refusal to perform is strong evidence of an intent not to perform the promise at the time it was made, as where only a short period of time elapses between the making of the promise and the failure or refusal to perform it, and there is no change in the circumstances.

*Tufts v. Poore,* 219 Md. 1, 10, 147 A.2d 717 (1959) (citations omitted). We conclude that this case does not fall within the *Tufts* criteria for proving fraud from an immediate breach without a change in circumstances, for two reasons.

---

2003 Cum.Supp.) § 11–1201 *et seq.* of the Commercial Law Article (CL). Indeed, it **repeatedly renounced** any claim that First Union stole or misappropriated trade secrets. These renouncements constituted a strategic decision not to subject its claims to the limitations contained in MUTSA. MUTSA provides for damages for misappropriation of a trade secret, which consist of the "actual loss caused by misappropriation," and "[t]he unjust enrichment caused by misappropriation that is not taken into account in computing actual loss[,]" or alternatively, a "reasonable royalty" for the misappropriation.. *See* CL § 11–1203(b)–(c). It also allows exemplary damages, but in "an amount **not exceeding** twice any award" allowed under a compensatory damage theory, upon proof of "willful and malicious misappropriation[.]" CL § 11–203(d)(emphasis added). MUTSA remedies displace "conflicting tort, restitutionary, and other law of this State providing civil remedies for misappropriation of a trade secret[,]" CL § 11–1207(a), except for contractual remedies. *See* CL § 11–1207(b)(i). Thus, a claim under MUTSA would have precluded 3S's claim for fraud. 3S elected to disclaim any MUTSA claim, and sued for breach of contract and fraud.

First, the bank did undertake at least partial performance under the SA through June 2000, a two and a half year period. It did not breach the Minimum Volume requirements until October 1999, nearly two years after signing the SA. Even Steele was happy with the volume of business that he got from First Union between the time the SA was executed in November 1997 and mid–1999. In May 1999, 3S announced by letter that it was dropping its prices, reserving the right to go back to higher prices "should we see a significant drop in volume." The 1999 volume preceding this letter averaged 3,464 per month, and the volume remained above 2,000 transactions per month until August 1999. Steele also expressed in a presentation to First Union in March of 2000 that their relationship had been "[t]remendous ... until consolidation in [New Jersey]," which took place in 1999.

From January 1998 through July 1999, First Union referred 3S 55,785 transactions, constituting an average of 2,936 transactions per month. Although, as we explain in section II, we think the jury could determine that these 55,785 transactions were not sufficient for full contractual performance, this was a substantial amount of business, approximately three times the Minimum Volume of 1,000 transactions per month, and more volume in most months than 3S had been receiving prior to the SA. Such meaningful partial performance, under these circumstances, precludes the jury from drawing an inference of fraudulent intent merely from the breach itself. *See Sass v. Andrew,* 152 Md.App. 406, 433–43, 832 A.2d 247 (2003)(fraud verdict against builder who promised to build house but did not finish reversed because builder partially performed).

Secondly, there was a significant change in circumstances after the signing of the SA and before the drop off in referrals. The bank originally thought that there were regulatory barriers to owning its own settlement company. Seven months after the SA was signed, however, the OCC issued an authorization for a competing bank to joint venture with a settlement services company. This regulatory action cleared the way for First Union to move toward forming or purchasing a settlement services company. Learning that it could

own a settlement services company itself may well have changed First Union's intentions with regard to buying these services from 3S. Thus, this case does not fit within *Tuft's* criteria for proving fraud largely by proving immediate breach.

Moreover, in 1999, First Union restructured the organization of its Consumer Lending Division, consolidating its management in Brunswick, New Jersey, rather than Charlotte, North Carolina. This was also a change in circumstance. The bank learned, after signing the SA, that other vendors in the New Jersey area were providing similar services at substantially cheaper prices, approximately $30 less per transaction. The undisputed evidence shows that Steele was slow to adjust his prices after Buzzi pointed out the differential, and initially sought to attach greater volume requirements to any adjustment. Although there is some evidence that 3S ultimately may have approached its competitors' prices, its recalcitrance in doing so also can be viewed as a change in circumstances—it could be a signal that a future "partnership" might prove difficult.

### Efforts To Terminate

Nor do the tactics used by First Union after execution of the SA suffice to meet 3S's burden to show precontract fraudulent intent. 3S argues that we should look at the bank's efforts to force termination of the SA, by "invent[ing] phony complaints about pricing," creating a "pretextual" billing dispute, and giving notice of termination before it was allowed to do so under the SA. These all happened in or after March 1999, more than a year into the term of the SA. The notice of termination is certainly evidence of an intent to ignore the contract terms, and to bully 3S into an early termination. The handling of the billing dispute may even reflect an effort to obscure the bank's intentional breach of the SA. In order to establish pre-contractual fraudulent intent by clear and convincing evidence, however, Maryland requires more than simply an intentional breach of contract. None of the cases relied upon by 3S proved fraudulent intent with

evidence as thin as this one, consisting entirely of post-contractual actions deliberately breaching the contract.

We cannot rest fraud in the inducement of a November 1997 contract on a billing dispute that surfaced in October 1998, and related to invoices dating from as early as 1994–1995, before the SA was executed.[17] We explain.

The invoices in question totaled $375,000.[18] Steele said that the invoices had been sent to First Union in the normal course of business, but that he again gave complete copies of all invoices in 1998 "to make sure there was no confusion on what was open and outstanding, to give them the information they needed to research and pay them[.]" First Union officials denied having received them, and asserted that it was difficult, and would take time, to verify transactions that were so old. Even if the jury believed that the bills were sent timely, we do not see how First Union's failing to pay bills incurred largely before execution of the SA showed an intent not to send new business, as required by the SA. This evidence is not sufficient to support fraudulent intent existing prior to the SA.

### 1993–1994 Discussions About A Settlement Services Company

Nor are discussions in 1993 or 1994 of future plans to acquire an interest in a settlement services company enough to show a fraudulent intent not to perform what Steele admitted was only a three year commitment. *Cf. Stop–N–Go of Madison, Inc. v. Uno–Ven Co.*, 184 F.3d 672, 678 (7th Cir.1999)(oil refining company's interest in and efforts to sell its rights to obtain crude oil, prior to entering a contract to supply gasoline to plaintiff, and to aggressively market its brand of gasoline, did not show fraudulent intent not to perform contract). This is especially so when one considers

---

**17.** According to Steele, many other invoices had been paid during the time period 1996–1998.

**18.** Between late September or October 1998, and May 3, 1999, when 3S wrote Buzzi, First Union paid $72,000 on the outstanding invoices, reducing the balance to $303,000.

that Steele knew that First Union was interested in an eventual purchase, because one of its officers told Steele that it might be interested in purchasing 3S.

### Clewis Testimony About Renewal Clause

3S claims that it proved fraud through Clewis's testimony about the renewal clause of the contract:

> Clewis testified that he never intended to extend the Service Agreement beyond two years, despite the clear language providing that it would be automatically renewable. Indeed, Clewis himself was forced to admit that the contract provided that it would run for three years.

Counsel's cross-examination of Clewis was artful, but upon close examination, cannot provide the foundation for fraud.

The colloquy went as follows:

Q: [At your deposition] you were asked whether or not you had an intent that there be renewals in the contract and do you recall your answer, sir?

A: Sir, my answer was yes, with the assumption that Mr. Steele would install the EDI and we would have ongoing relations and it would be no need for a contract.

Q: Sir, was there an intent on your part that there be renewals in the contract, yes or no?

A: Not a written contract, no, sir.

Q: So you never intended that there be a renewal?

A: I saw no need to do a renewal, if we get—— fulfilled our agreement, there would be no need to do a written contract ever again. . . .

Q: How did this section 4.2, sir, renewal, get into this agreement if it was your intent that there be no renewals of this contract, how did it get in there?

A: I'll tell you. Every year Mr. Steele and I would sit down and renegotiate pricing. We're not going to pay the same price, this is a competitive business, prices are coming down, we knew it in the marketplace, the terms, the turn

around times were spelled out. EDI was spelled out. . . . I wasn't signing anything we had to renew year after year.

Q: Sir, it was in the agreement, correct?

A: It says renewable.

A short time later, 3S counsel asked Clewis:

Q: Can Mr. Steele rely, when this agreement where it says he's going to get a one year notice of cancellation at some point, not before May 1 $^{st}$, 2000, is that what it says, sir?

A: Mr. Steele did not rely on anything beyond two years which was spelled out in that contract.

Q: Does this contract say, sir, you don't have to be a lawyer to read this, does this contract say that you cannot deliver a notice of termination before May 1 $^{st}$, 2000?

A: It does say that, yes.

Q: And does it also say that he would get a one year notice of cancellation?

A: It does say that.

Q: So you know enough to tell us that this contract says that at a very minimum it's going to run until May 1 $^{st}$ 2001, that's what this says?

A: That is what the contract says, yes, sir.

■ This dialogue does not support a claim for fraud for two reasons. First, making a contract "automatically renewable," is not a promise to renew. It means that the parties **may** renew it—that the contract is **capable** of being renewed, and without notice to the contrary, it will be renewed. Second, whether Clewis intended to renew the term of the SA is a different question from whether the notice of termination clause effectively added a third year to the stated two-year term. Clewis stated that he did not intend to renew the written contract, although he expected the relationship would be ongoing. Although he said that Steele did not rely on more than two years, he did not say that he never intended to abide by its one-year, post-May 2000 notice of termination requirement. We simply cannot view this colloquy as being evidence

of a pre-existing intent not to abide by the notice of termination provision of the contract.

### January 29, 1997 Letter

3S makes much of Steele's January 29, 1997 letter to Thompson, which followed a meeting regarding 3S's proposals for centralization and automation of First Union's branches. Steele's letter sought confirmation that it had been agreed that 3S would be the bank's "preferred provider of appraisal, title and settlement services" in certain limited categories. 3S argues that this showed that "Clewis and Thompson had no intention of honoring their obligations to 3S." We do not see how Thompson's failure to respond to the letter, or his note to Clewis that "we didn't make any promises but would entertain their proposals," is evidence of fraudulent intent not to perform First Union's obligations under the SA.

It is intelligent business practice for a corporate employee to be careful to appreciate the difference between discussing proposals and actually making a contractual commitment. Thompson's failure to write Steele back might be evidence of fraud if 3S were suing for fraudulently inducing it to provide services without a written contract. But the fact that 3S later **actually entered** into the SA reflects not dishonesty, but a willingness to commit to its obligations in writing and better define the parties' relationship.[19]

### 3S's Cases On Fraudulent Intent

The cases cited by 3S on inferring fraudulent intent do not persuade us otherwise. In *Tufts v. Poore*, 219 Md. 1, 147 A.2d 717 (1959), a wealthy woman with a lovely home on the Potomac, called "Tulip Hill," wrote a 1948 will in which she left a life estate in Tulip Hill, and one half of her other assets, to her daughter, with the remainder interest to pass to her son and his descendants. Although the testatrix disliked her

---

19. As we discuss later in this section, we consider the phrase "preferred provider" too vague and general to amount to an actionable misrepresentation.

daughter's husband, at her daughter's request, on July 3, 1955, the testatrix executed a codicil to that will, simultaneously with the daughter executing a will of her own. The mother's codicil left Tulip Hill outright to her daughter in fee simple. She also left substantial other assets to her daughter outright, with the "request that she divide them equally among the testatrix' grandchildren upon her death." *Id.* at 7, 147 A.2d 717. At this time, the testatrix's son was ill with leukemia. The daughter's will, executed at the same time, designated her brother as a beneficiary.

After the two documents were signed, the testatrix requested her son-in-law to put them on her desk. There was evidence that it was the testatrix's and her daughter's intent that the two testamentary documents would go into the testatrix's safety deposit box. Three days after the two documents were signed, the testatrix and her daughter and son-in-law departed for a trip to Europe, returning on August 20, 1955. A few days after the return from Europe, the daughter placed her mother's codicil in her mother's lock box at the bank, and put her own will in a strong box in her study.

The testatrix's son died less than two months later, on October 14. Sometime between then and the testatrix's death in February 1956, the daughter destroyed her will, without advising her mother.

The Court of Appeals concluded that there was sufficient evidence for the jury to infer that the daughter had never intended to maintain her will in effect, thereby depriving the descendants of her brother from inheriting those assets left to her by her mother. *See id.* at 12, 147 A.2d 717. The Court relied on the principle stated above, that

under certain conditions, a failure or refusal to perform is strong evidence of an intent not to perform the promise at the time it was made, as where only a short period of time elapses between the making of the promise and the failure or refusal to perform it, and there is no change in the circumstances.

*Id.* at 10, 147 A.2d 717. Recognizing that fraud "is generally [proven] by circumstances only, by inductions of particulars, some of them often apparently trivial," *id.* at 12, 147 A.2d 717 the Court of Appeals afforded guidance on how a court should value facts relating to fraudulent intent:

> In valuing facts relating to the question of a present intention not to perform a promise made, courts have frequently stressed the importance and significance of the situation of the parties, the relations existing between them, the activity of the promisor in procuring the instrument, and the failure of the promisor to perform.

*Id.* at 10–11, 147 A.2d 717.

We see marked differences between *Tufts* and this case. There, the jury could have inferred that the daughter never intended to maintain her will because, as soon as she returned from Europe, she failed to put it in her mother's lock box as the parties intended. Moreover, within six months at the outside,[20] the daughter changed her will, doing **exactly** what she promised her mother she would not do. In contrast, here the bank did not breach the Minimum Volume for almost two years, and any early breach that the jury found must have related to the "best efforts" clause, with its imprecise obligations for performance.

The circumstances of the making of the *Tufts* agreement were different as well. In *Tufts,* the daughter was the sole instigator of the change in the mother's will, which benefitted only her and her heirs, rather than her mother. Here, we have a negotiated agreement, strongly pursued by 3S, which benefitted both parties.

*Greenfield v. Heckenbach,* 144 Md.App. 108, 797 A.2d 63, *cert. denied,* 370 Md. 269, 805 A.2d 266 (2002), also cited by 3S, was an appeal from a summary judgment in favor of the defendants. The decision turned on whether an integration clause in a contract for sale of a waterfront property preclud-

---

**20.** The evidence did not reveal exactly when the daughter destroyed her will.

ed, under the parol evidence rule, introduction of representations made by the seller of a house as to his intent to obstruct the view by building on his adjacent lot. The defendants did not argue, and we did not address, the sufficiency of the evidence to show fraudulent intent.

*Bocchini v. Gorn Mgmt. Co.*, 69 Md.App. 1, 22, 515 A.2d 1179 (1986), is not helpful to 3S because there we held there that the allegations of fraud in the complaint were insufficient to withstand a motion to dismiss.

*Henderson v. Md. Nat'l Bank*, 278 Md. 514, 366 A.2d 1 (1976), was not a fraud case. The bank admitted liability for conversion when a bank employee ordered repossession of the plaintiff's car for non-payment, when in fact all payments had been timely. The Court of Appeals held that there was sufficient evidence to show actual malice when the employee summarily ordered repossession, without checking with other bank employees, after an angry telephone conversation in which the plaintiff explained the previous errors the bank had made in thinking his account was delinquent because they had another customer by the same name. *See id.* at 523, 366 A.2d 1. The employee's immediate summary repossession following an angry phone call, without checking the facts, is compelling evidence of malice. Here, we have no such evidence.

In *Gross v. Sussex, Inc.*, 332 Md. 247, 630 A.2d 1156 (1993), also relied on by 3S, the Court of Appeals reversed summary judgment in favor of a contractor on a claim for fraudulent inducement because there was evidence that the contractor, prior to signing a contract for construction of a home, falsely told the plaintiffs that permits were in place, so that he could immediately start work on construction. *See id.* at 276, 630 A.2d 1156. The Court found sufficient evidence of fraudulent intent because the plaintiffs were able to show that, at the time he made the statement, there was no subdivision approval, and hence no building permits. *See id.* There is no comparable factual misrepresentation demonstrated in this case.

3S asserts that fraudulent intent can be inferred from circumstantial evidence, citing *State v. Raines*, 326 Md. 582, 591, 606 A.2d 265, *cert. denied*, 506 U.S. 945, 113 S.Ct. 390, 121 L.Ed.2d 299 (1992), and *Geisey v. Holberg*, 185 Md. 642, 45 A.2d 735 (1946).[21] This is certainly true, and, as we see above, the *Tufts* case permitted an inference of fraudulent intent from circumstantial evidence. But neither *Raines* nor *Geisey* are analogous to this case.

In *Raines*, the issue was whether a trier of fact could infer defendant's specific intent to kill from evidence that he shot at the driver's window of a tractor-trailer being driven down the highway. The Court held that "Raines' actions in directing the gun at the window, and therefore at the driver's head on the other side of the window, permitted in inference that Raines shot the gun with the intent to kill." *Raines*, 326 Md. at 592–93, 606 A.2d 265.

*Geisey* involved a scheme by an estranged husband and his good friend and business associate to deprive his wife of her interest in real property through a foreclosure proceeding. The specific facts in *Geisey* are complex, and do not warrant detailed recitation here. Suffice it to say, we simply do not find the evidence of post-contract breach by First Union analogous to those facts. To be sure, the Court of Appeals in *Geisey* observed:

> Fraud cannot be easily proved by direct evidence because of the secrecy with which it generally is surrounded, but a court of equity cannot close its eyes to a series of circumstances, all pointing one way, indicating one purpose in view.

*Geisey*, 185 Md. at 653–54, 45 A.2d 735. We are not requiring that 3S provide **direct** evidence, but only that the post-contract circumstantial evidence sufficiently relate back to circumstances that existed before execution of the SA.

---

**21.** 3S also cites *Pearson v. State,* 8 Md.App. 79, 258 A.2d 917 (1969), for the same proposition. There, we ordered a new trial after the defendant was convicted of uttering a forged instrument because the trial judge refused to instruct the jury that guilty knowledge was an element of the offence.

The evidence that First Union had some interest in a future acquisition of a settlement services company in 1993–1994 is not sufficient. Such an interest is not necessarily inconsistent with a three year commitment to buy those settlement services from 3S, particularly when the bank accepted then prevailing views that existing regulations made such a purchase illegal. First Union could have waited three years and not been in breach of its promise. This is unlike the situation in *Tufts*, where the daughter's desire to leave assets to her husband was diametrically at odds with her promise to leave them to her brother's descendants.

Maryland differentiates between intentional breach and fraud with good reason. Contracts are often breached when companies change their business direction because of competitive market forces. Business persons entering contracts know and expect this. Many times, because the parties anticipate potential breach, contracts provide for liquidated damages and/or attorney's fees if breach occurs. The law provides a remedy for breach. Businesses will be hesitant to enter contracts at all if a breach, without evidence of pre-existing fraudulent intent, can expose them to punitive damage awards.

### Representations Collateral To The SA

3S argues that

[T]he record is clear that [First Union] made fraudulent representations both in and collateral to the [SA], and that 3S relied on such representations in executing that Agreement and in preparing to service an increased commitment to [First Union] on a long-term basis.

3S points specifically to the following verbal representations:

(1) In his discussions and plans with Steele in 1995–1997, Dibble told Steele that the parties would have a "long-term mutually beneficial relationship."

(2) Crisp and Clewis said "as we grow, you'll grow." Crisp also asked whether 3S "could handle 12,000 transactions on a monthly basis" and "left it to Parkes [Dibble] to work out the rest."

(3) Prior to June 1996, Dibble said that the SA was only "the first step [in the parties'] long road partnership."

(4) Dibble negotiated a "five year contract with like renewals," meaning that the parties would have a ten-year relationship.

(5) After he took over from Dibble, Clewis said "don't worry, everything's fine, nothing's changed[.]"

(6) The January 29, 1997 letter from Steele to Thompson, expressed Steele's understanding that 3S was to be the bank's "preferred provider of appraisal, title and settlement service[s];" First Union did not respond.

(7) Clewis told Steele that the term of the SA was two years, and that "[i]t would automatically be renewed each and every year thereafter, which was consistent of [sic] the long-term relationship, partnership that we expected and it would continue going unless I screwed up."

As we explain below, we conclude that the representations identified as numbers (1), (2), (3), (5), and (6) are overly general statements of expectation that are not sufficiently definite in terms for a sophisticated business person to reasonably rely on. The representations identified as numbers (4) and (7) were sufficiently definite, but could not reasonably be relied on by a sophisticated business entity entering a negotiated contract because they were contradicted by the explicit terms of the SA. Although in certain instances, fraud can be premised on representations that are inconsistent with a written agreement, we do not agree that the circumstances of this case allow such recovery.

### Overly Vague Statements Of Expectation

The Court of Appeals has differentiated between general expectations and actionable representations for over a hundred years. In *Robertson v. Parks*, 76 Md. 118, 132, 24 A. 411 (1892), the Court explained:

[R]epresentations to be material, must have been in respect of ascertainable facts, as distinguished from mere matters of opinion or speculation. A representation which merely

amounts to a statement of opinion, judgment, probability or expectation, or is vague and indefinite in its nature and terms, or is merely a loose, conjectural, or exaggerated statement, goes for naught, though it may not be true; for a party is not justified in placing reliance on such statement or representation.

Relying on *Robertson*, the Court, seventy years later, reaffirmed this limitation on claims of fraud:

Ordinarily, however, the representation must be definite, and mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements.

*Fowler v. Benton*, 229 Md. 571, 579, 185 A.2d 344 (1962), *cert. denied sub nom. Fowler v. Bd. of County Comm'rs*, 375 U.S. 845, 84 S.Ct. 98, 11 L.Ed.2d 72 (1963).

Comment a to *Restatement (Second) of Torts* (1977), section 530 excludes from actionable fraud those statements in a business transaction that are merely "puffing":

The state of a man's mind is as much a fact as the state of his digestion. A false representation of the actor's own intention to do or not to do a particular thing is actionable if the statement is reasonably to be interpreted as expressing a firm intention and not merely as one of those "puffing" statements which are so frequent and so little regarded in negotiations for a business transaction as to make it unjustifiable for the recipient to rely upon them.

We find instructive the Court of Appeals' decision in *Milkton v. French*, 159 Md. 126, 150 A. 28 (1930). There the plaintiff purchased from the defendants a lot, which was improved with a bungalow. The plaintiff was concerned about the basement and the roof "because [he had heard] so many complaints here in Baltimore about the damp cellars and leaking roofs." *Id.* at 129, 150 A. 28. He requested that the defendants insert a covenant in the documents of sale assuring that "the construction [of the bungalow] is right." *Id.* at 130, 150 A. 28. When the seller was called to inquire if he was

willing to include this covenant, he said that he "refused to give any assurance of heating the house to 70 degrees," but the purchaser "was perfectly safe on the concrete, roof and everything else of the construction because [he] had built it himself." *Id.* The Court held that the seller's statement about the condition of the house was mere puffing:

> In the first place, the use of the term "perfectly safe" in connection with every detail of construction was so extravagant in scope and measure, and so indefinite and elusive in meaning, that the statement would fall within the category of a puff instead of a representation, and the plaintiff, who was an architect of experience, could not have been misled or influenced.... It is difficult to find these words, when reasonably considered, as capable of being understood by a man of average intelligence as a clear and definite representation of any particular fact. The language does not condescend to detail. **The words used are so vague and general as to be incapable of particular application.** They fail, therefore, to amount to a misrepresentation, and are but the indefinite generalities of exaggeration.

*Id.* at 132–33, 24 A. 411 (citations omitted and emphasis added).

In a more recent case, this Court in *McGraw v. Loyola Ford, Inc.,* 124 Md.App. 560, 566, 723 A.2d 502, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999), affirmed a summary judgment in favor of a car dealer on a fraud claim, based on his statement that the demonstrator vehicle sold was "the most outstanding value" on the lot, and that "every consideration in pricing and/or trade in allowance has been given to reduce the settlement price to its lowest." We held that these statements amounted to "indefinite generality" and "puffing" by the dealer. *See id.* at 582, 723 A.2d 502.

In *Parker v. Columbia Bank,* 91 Md.App. 346, 360, 604 A.2d 521, *cert. denied,* 327 Md. 524, 610 A.2d 796 (1992), we held that a home construction lender's assurances to its borrower that there was no need to have bank lawyers investigate the contractor mid-job because the "value was in the ground," was only an opinion, and not a factual representation.

 Here, these statements about a "long term mutually beneficial relationship," "long term relationship," "as we grow, you'll grow," and "long term partners" have no concrete terms, and are general statements of expectation or opinion. We think they fall into the category of being "so vague and general as to be incapable of particular application." *Milkton*, 159 Md. at 133, 150 A. 28. When dealing with transactions involving potentially millions of dollars, a sophisticated business entity cannot reasonably rely on such vague and general statements, particularly when the parties contemplate a written agreement that will define their relationship.

Similarly, in this context, the statement that the SA is "only the first step to a long road partnership" can only be seen as a statement of general expectation. The parties discussed various and complex ways of working together. There were simply too many potential ways for these two organizations to structure a "long road partnership" for those words to constitute a meaningful representation. When the parties were negotiating the terms of a concrete written agreement, statements about what further complex agreements they might enter down the road, without any concrete terms, cannot reasonably be relied on as anything more than statements of expectation.

 Nor are statements that 3S would be the "preferred provider" of certain services sufficiently concrete to warrant reliance. *See, e.g., Travel Comm., Inc. v. Pan Am. World Airways, Inc.*, 91 Md.App. 123, 180, 603 A.2d 1301, *cert. denied*, 327 Md. 525, 610 A.2d 797 (1992)(representations that wholesale travel agent would be Pan Am's "most favored nation" were mere puffery); *Snyder v. Greenbaum & Assocs., Inc.*, 38 Md.App. 144, 149, 380 A.2d 618 (1977)(carpet supplier's estimate of how much carpet needed for job was not misrepresentation justifying rescission of contract).

These representations differ markedly from those found actionable in *Giant Food, Inc. v. Ice King, Inc.*, 74 Md.App. 183, 536 A.2d 1182, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988), a case heavily relied on by 3S. There, Giant's represen-

tations about its commitment to buy ice from Ice King included very specific terms: "the type, price, quality, and quantity of ice;" "the delivery terms;" "the location of Ice King's plant at a site most suitable to Giant;" "the size of the storage facility needed to satisfy Giant's demand;" "arrangements for inspection of Ice King's plant by Giant representatives;" and "the demand by Giant that Ice King supply further samples of ice and a certificate of insurance." *Id.* at 191, 536 A.2d 1182. This level of detail was not discussed by 3S and First Union except in connection with negotiating the SA itself. In *Giant Food,* the parties never discussed a written contract, and certainly never entered one with a specific termination clause. Rather, the principal of Ice King told Giant that he had "invest[ed] everything he owned" based on his reliance on Giant's buying ice from him and Giant authorized him to state on his loan application that Giant was going to buy ice from him. *See id.* at 192–93, 536 A.2d 1182. In contrast, here, Steele testified that he needed the written SA, with its guarantee of volume, in order to obtain his financing. Thus, the parties contemplated that their agreement would not be final until a written agreement containing specific terms was executed.

3S cites the Fourth Circuit's decision in *Edell & Assocs. v. Law Offices of Peter G. Angelos,* 264 F.3d 424 (4th Cir.2001), as support for the proposition that these pre-contract representations were sufficiently definite to be actionable. We are not persuaded.

Edell alleged that the Law Offices of Peter G. Angelos ("Angelos Firm") breached a contract to pay Edell, an attorney with expertise in mass tort tobacco litigation, a fair share of any contingency fee recovered, in addition to his hourly fee, in return for his work with the Angelos Firm in litigation brought by the State of Maryland against the tobacco industry. Edell also alleged false representations of the Angelos' Firm's intent to pay the contingency award. Both the contract and fraud claims were based on statements such as: Angelos would "deal with him fairly[;]" Edell would be "generously compensated[;]" Edell would receive "additional compen-

sation" above hourly rates; they were "partners in the tobacco litigation[;]" they would experience a "rewarding partnership[;]" there would be a "one for all team approach[;]" and "when the litigation was resolved, Peter will do the right thing." The Fourth Circuit vacated the summary judgment entered by the federal district court for Maryland in favor of the Angelos Firm on both the contract and fraud counts. *See id.* at 428.

Regarding the contract claim, the court relied heavily on Maryland Rule of Professional Conduct (MLRPC) 1.5(e)(2), which provides with respect to contingency fees, that "[a] division of fee between lawyers who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation." The court reasoned that, although the parties never agreed on a specific percentage of the contingency fee, the contract to share fairly the contingency fee was so overly vague as to be enforceable because the MLRPC 1.5(e)(2) "in proportion" standard was sufficiently definite to allow the fact finder to resolve any dispute as to the actual proportion. *See id.* at 443. With this rule in the place, the court reasoned, "the missing term sought to be supplied is implied by law rather than the court." *Id.*

The Fourth Circuit was brief in its analysis of Edell's fraudulent inducement claim, reasoning that the summary judgment record

> reveals a masterful plan by the Angelos Firm to fraudulently benefit from Edell's undisputed reputation and experience as a tobacco litigation expert by luring him and his law firm into falsely believing the Angelos Firm would share fairly ... any contingency fee it might receive at the conclusion of the Maryland AG Action if they continued their substantial participation in the case at the expense of working on other fee-generating cases.

*Id.* at 445.

We interpret the Fourth Circuit's decision on the fraud claim in light of its analysis of the contract claim. Just as it

found that the MLRPC 1.5 requirement that fees between separate law firms be divided in proportion to the work performed sufficient to imply a missing contractual term, we think it considered that the representations that a fair contingency fee would be paid were also sufficiently specific to form the basis for fraud because MLRPC 1.5 gave them a concrete meaning. Because there is no profit-sharing standard for bank joint ventures under Maryland law, no such concrete meaning can be attached to the promises of a "long term mutually beneficial relationship" and a "long road partnership" that 3S relies on here. *Edell* is also distinguishable because the disputed issue involved the fee in a single, albeit large, lawsuit, rather than the general and broad concepts of "relationship" and "partnership" on which 3S relies. Further, the parties in *Edell* did not contemplate, as they did here, that their agreement would not be final until a written contract containing specific terms was executed.

### Representations Contradicted By The Terms Of The SA

 Dibble's statements that he made an agreement for two five-year terms, or a "ten-year agreement" with Steele, is certainly more specific than the general statements discussed above. This term, however, was specifically negotiated out of the SA, and a three-year contract (a two-year term, with an additional year's notice of termination which could not be given until the end of two years) was substituted. 3S cannot reasonably rely on an agreement or representation that was specifically negotiated out of the parties' contract. *See, e.g., Cooper v. Berkshire Life Ins. Co.*, 148 Md.App. 41, 60–63, 810 A.2d 1045 (2002), *cert. denied,* 373 Md. 407, 818 A.2d 1105 (2003)(in fraud action, plaintiff cannot reasonably rely on oral statements that contradict terms of insurance policy he was purchasing); *see also Md. Environmental Trust v. Gaynor,* 370 Md. 89, 98–99, 803 A.2d 512 (2002) (in negotiating terms of environmental easement, clear language of letter to plaintiff precluded reliance on earlier, inconsistent statements). *See also Mellon Bank Corp. v. First Union Real Estate Equity & Mort., Inv.,* 951 F.2d 1399, 1406 (3d Cir.1991)(in transaction

negotiated by two sophisticated businessmen, oral promises that directly contradict the written agreement cannot reasonably be relied upon); *One–O–One Enter., Inc. v. Caruso,* 848 F.2d 1283, 1287 (D.C.Cir.1988)(removal of clause from contract containing integration clause must be deemed abandonment of that clause, even in face of explicit earlier representations); *Call Carl, Inc. v. B.P. Oil Corp.,* 554 F.2d 623, 630–31 (4th Cir.1977) (oral representation that contract would only be terminated with good cause cannot be relied upon in face of clear right to terminate without good cause set forth in contract)(cited with approval in *Greenfield v. Heckenbach,* 144 Md.App. 108, 128, 797 A.2d 63, *cert. denied,* 370 Md. 269, 805 A.2d 266 (2002)).

In *Mellon Bank,* Mellon negotiated two separate loan transactions with First Union Real Estate Equity and Mortgage ("First Union Equity"), involving different real estate development projects, both of which were documented by detailed loan agreements. In one deal, Mellon loaned money to First Union Equity, and in the other First Union Equity loaned money to Mellon. Under the loan agreements, Mellon's loan to First Union Equity allowed prepayment without penalty by the borrower, but First Union Equity's loan to Mellon did not. When First Union Equity prepaid its loan, Mellon alleged an oral side agreement by which First Union Equity promised that, if it pre-paid its loan, it would otherwise protect Mellon against the market risk of a decline in interest rates. The Third Circuit rejected Mellon's claim of fraud, reasoning that Mellon could not have reasonably relied on First Union Equity's oral promises not to prepay without protecting Mellon against a decline in interest rates.

The agreements in this case are between sophisticated businessmen. Mellon Bank is a major banking institution. After consulting with counsel at all stages of the transaction and closing on detailed written documents, it is not reasonable for Mellon to rely on oral promises that directly contradict the written agreements between the parties.... When Mellon formally agreed to First Union [Equity's] terms when it executed the agreement, it should have

known it was left to First Union [Equity's] good offices, not the law, to insulate it from market risk if First Union [Equity] prepaid. Under the circumstances present here, we are unable to say Mellon could justifiably rely on a gentlemen's agreement not to do what the formal agreement gave one party, but not the other, the right to do.

*Id.* at 1412 (citations omitted).

Our holding in *Parker v. Columbia Bank*, 91 Md.App. 346, 363, 604 A.2d 521, *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992), that in a consumer banking transaction, parol evidence did not bar introduction of certain fraudulent statements that contradicted the parties' written agreement, is not contrary. First, we are not basing our decision on the parol evidence rule. Unlike *Parker*, which was an appeal from the dismissal of a complaint, we are evaluating the sufficiency of the evidence to show fraud. More importantly, we noted in *Parker* that, although the buyers were professional people, "they had little or no experience in real estate transactions; had never built a custom home; [and] were relying on Columbia's counsel, advice and representations regarding all aspects of the project that related to financing[.]" *Id.* at 362, 604 A.2d 521. We distinguished a transaction between two businesses, expressing the view that "[a] commercial borrower's reliance on these sorts of representations ... might well be unreasonable as a matter of law". *Id.*[22]

Clewis's statement to Steele that the term of the SA was two years, and that it would be "renewed each and every year

---

**22.** *Smith v. Rosenthal Toyota, Inc.*, 83 Md.App. 55, 573 A.2d 418, *cert. denied*, 320 Md. 800, 580 A.2d 219 (1990), is also distinguishable. There the court reversed summary judgment in favor of the defendant based on alleged fraudulent representations made by a car dealership that a contract to purchase a vehicle was just a "formality" and would not be effective until Mr. Smith obtained the consent of his wife. We rested our decision on the doctrine that, " 'where the parties to a written agreement agree orally that performance of the agreement is subject to the occurrence of a stated condition, the agreement is not integrated with respect to the oral condition.' " *Id.* at 62, 573 A.2d 418 (quoting *Restatement (Second) of Contracts* § 217). There was no oral condition that the SA would only be effective upon occurrence of a stated condition.

thereafter, which was consistent of [sic] the long-term relationship, partnership that we expected and it would continue going unless I screwed up," is also contradicted by the clear termination provisions of the SA. Section 4.3 unequivocally says that "First Union may terminate this Agreement without cause after May 1, 2000[.]"

We observe, moreover, that Steele did not testify that Clewis promised him that First Union would not exercise its right of termination. To the contrary, Steele testified that he knew the agreement might only last for three years:

Q: Mr. Steele, what if anything did Mr. Clewis say to you about the term of this agreement, the final agreement?

A: The term, it was two years. It would automatically be renewed each and every year thereafter, which was consistent of the long-term relationship, partnership that we expected and it would continue going unless I screwed up....

Q: What was the absolute minimum length of this agreement under the language here?

A: Three years.... The initial term was two years. It would automatically renew for a year thereafter. First Union had the opportunity to terminate the agreement but they had to give me one year's notice of cancellation, at some point after, I think it was May 1st, 2000.

Given the clear language of the SA, and Steele's understanding about its limited term, we cannot affirm a finding of fraud predicated on a promise of a longer term.

### Conclusion Regarding Fraud

In sum, we hold that there was insufficient evidence to support 3S's claim for fraud, based either on representations in the SA, or representations made prior to its execution. Accordingly, the trial court erred in denying First Union's motion for judgment notwithstanding the verdict. We reverse the trial court's ruling, and accordingly reverse the judgment in the amount of $39,476,342 based on fraud. We also reverse the judgment for $200,000,000 in punitive damages because

punitive damages are only allowable when there is a valid award of compensatory damages based on a tort. *See Wrexham,* 350 Md. at 703 n. 2, 715 A.2d 188. We next address, and reject, First Union's arguments challenging the $37,476,342 award of compensatory damages for breach of contract.

## II.

### The Evidence Was Sufficient To Prove Breach Of The Best Efforts Clause

Contracts in Maryland are subject to the law of objective interpretation. *See Taylor v. NationsBank, N.A.,* 365 Md. 166, 178, 776 A.2d 645 (2001). This means that the clear and unambiguous language of a written agreement controls, even when the language is not consistent with the parties' actual intent at the time of the creation of the contract. *See Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999). Contractual language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods,* 353 Md. 425, 436, 727 A.2d 358 (1999). The determination of whether contract language is ambiguous is a question of law for the court. *See Ashton,* 354 Md. at 341, 731 A.2d 441. When the language is ambiguous, the trier of fact, in this case the jury, must determine "what a reasonable person in the position of the parties would have thought it meant." *Fultz v. Shaffer,* 111 Md.App. 278, 299, 681 A.2d 568 (1996). In such case, the parties "will not be allowed to place their own interpretation on what it means or was intended to mean[.]" *Id.*

First Union argues that the best efforts clause of the SA does not give rise to a valid claim for breach of contract. First Union offers three grounds in support of this conclusion. First, it claims the best efforts clause was too vague to be enforceable, and suffered from an absence of mutual assent. Second, it urges that there was no evidence in the record, either from the SA or extrinsic evidence, to support 3S's contention that a reasonable person entering the SA, in First

Union's position, can be said to have "agreed to obligate itself to use 3S on a virtually exclusive basis." Third, it insists that "[t]he record demonstrates that Steele himself did not believe that the best efforts clause imposed any binding obligation on [First Union]." We find these contentions unpersuasive.

## Best Efforts Not Too Vague To Be Enforceable And Mutual Assent Shown

We said in section I that there could be no inference of fraud from First Union's merely signing the SA, with its best efforts clause, without intending to give 3S more than 50% of its business. We reached this conclusion because we do not consider the language of the SA sufficiently clear to draw an inference that Clewis, on behalf of First Union, **necessarily** knew that he was committing to send 3S more than 50% of its volume because of the ambiguous definition of "Services," the non-exclusivity clause, and the 130% Clause. We concluded that the evidence was sufficient to show only that Clewis believed that, in agreeing to the best efforts clause, First Union was obligated to make diligent efforts to send a substantial amount of business to 3S, without defining that level of diligence by specific volume.

The lack of specificity in the best efforts clause does not mean, however, that the clause was meaningless. The term "best efforts," while not clearly defining a specific percentage or amount of business, "is a standard that has diligence as its essence[.]" *See E. Allan Farnsworth, On Trying to Keep One's Promises: The Duty of Best Efforts in Contract,* 46 Pitt. L.Rev. 1, 8 (1984). As we indicated, it is a term that "takes its meaning from the circumstances." *Bloor v. Falstaff Brewing Corp.,* 454 F.Supp. 258, 266 (S.D.N.Y. 1978), *aff'd,* 601 F.2d 609 (1979). In determining whether the performance by 3S met the "best efforts" standard in this context, we think the jury was entitled to consider such things as, the overall volume of First Union, the level and promptness of service provided by 3S, 3S's ability to handle an increasing amount of volume as time went on, the reasonable business needs of a large regional bank to place its business

with multiple vendors, the risks First Union took in sending the majority of transactions to one vendor, what business people mean when they promise to make "best efforts," and the standard in the industry regarding similar contracts between banks and their settlement service vendors. The performance required of the parties by a best efforts clause may be explicit in the contract or implied from the circumstances. *See NCNB Nat'l Bank of N.C. v. Bridgewater Steam Power Co.*, 740 F.Supp. 1140, 1152 (W.D.N.C.1990). A party committed to using best efforts may still give reasonable consideration to its own interests. *See id.* The jury also was able to consider the reasonable expectations of Steele in light of the pattern of his discussions and negotiations with Dibble and Clewis. We do not consider it critical to the formation of the contract that the parties did not specifically discuss what "best efforts" meant.

When contracting parties enter business relationships that cannot be specifically defined in advance, they set up standards that will allow a neutral decision maker some basis for decision. *See* Mark P. Gergen, *The Use of Open Terms in Contract*, 92 Columbia L.Rev. 997, 1000 (1992)("open terms" such as best efforts clauses are "similar in form or function to a negligence rule"). In doing so, they recognize that there is a certain murkiness to exactly how that standard will be applied to the business circumstances that eventually exist.

This uncertainty, however, does not preclude formation of an enforceable contract if that is what the parties intended. Thus, best efforts clauses generally have been held enforceable because the parties intend to be bound, and there is an articulated standard. *See, e.g., Mor–Cor Packaging Prods., Inc. v. Innovative Packaging Corp.*, 328 F.3d 331, 334, 2003 U.S.App. LEXIS 8288, *5 (7 th Cir.2003)(factual determination as to whether best efforts clause breached); *Western Geophysical Co. of Am., Inc. v. Bolt Assocs. Inc.*, 584 F.2d 1164, 1169–73 (2d Cir.1978)(construing best efforts clause); *Bloor*, 454 F.Supp. at 272 (finding breach of best efforts clause); *CKB & Assocs., Inc. v. Moore McCormack Petroleum, Inc.*, 809 S.W.2d 577, 581–82 (Tex.Ct.App.1991)(failure to use best ef-

forts).[23] *See also* E. Allan Farnsworth, *Farnsworth on Contracts* § 7.17c, at 381 (2d ed.1998)(best efforts clauses are no longer considered too indefinite to be enforceable).

Other cases have construed different non-specific contractual standards. *See, e.g., Scamardella v. Illiano,* 126 Md.App. 76, 90, 727 A.2d 421 *cert. denied,* 354 Md. 115, 729 A.2d 406 (1999)(co-plaintiffs' agreement to agree or have court apportion settlement proceeds obtained from insurer for third party tortfeasor was not void for vagueness); *Pillois v. Billingslcy,* 179 F.2d 205, 207–08 (2d Cir.1950)(contract to pay a satisfactory amount or render "satisfactory service" is enforceable as promise to perform as reasonable person would); *Hauser v. Rose Health Care Sys.,* 857 P.2d 524, 528 (Colo.Ct.App.), *cert. denied,* 1993 Colo. LEXIS 729 (1993)(contract providing compensation on "costs saved" from contracts re-negotiated by plaintiff on defendant's behalf was not indefinite by reason of difficulty of calculating savings); *Bettancourt v. Gilroy Theatre Co.,* 120 Cal.App.2d 364, 261 P.2d 351, 372–73 (Cal.Ct. App.1953)(a contract to build a "first class theater" was enforceable; parties were not concerned about particulars, but rather, bargaining for a general result); *Bohman v. Berg,* 54 Cal.2d 787, 8 Cal.Rptr. 441, 356 P.2d 185, 191–92 (Cal.1960)(agreement to turn a Greyhound bus into a luxurious "land yacht" was enforceable); *Delorafano v. Delafano,* 333 Mass. 684, 132 N.E.2d 668, 687 (Mass.1956)(promise to increase wages if business should improve was enforceable even though amount was unspecified); *Corthell v. Summit Thread Co.,* 132 Me. 94, 167 A. 79, 80, 82 (Me.1933)("reasonable recognition" for inventions by employee, "the basis and amount of recognition to rest entirely" with the employer, was enforceable term). *See also* 1 Joseph M. Perillo, *Corbin on Contracts,* § 4.1, at 530 (Revised ed.1993) ("court must take language as it is and people as they are. All agreements have

---

**23.** We recognize that in these cases, the "best efforts" were directed toward accomplishing something not totally within the control of the promisor, while here, First Union had substantial control over how many transactions it referred to 3S. We do not think this difference precludes application of a similar best efforts standard.

some degree of indefiniteness and some degree of uncertainty").

A rational juror could infer that the parties had a meeting of the minds and therefore met the requirement of mutual assent because they understood that First Union was undertaking to be reasonably diligent in referring business to 3S. They agreed to the standard of " 'best efforts,' on a nonexclusive basis. They did not necessarily agree on exactly what volume of referrals would meet that standard. First Union clearly had some discretion in determining what was diligent. *See Brewster of Lynchburg, Inc. v. Dial Corp.*, 33 F.3d 355, 364–65 (4 th Cir.1994)(in requirements contract, buyer was entitled to reduce its requirement to zero, so long as it did so in good faith); *Angelica Uniform Group, Inc. v. Ponderosa Sys., Inc.*, 636 F.2d 232, 232 (8 th Cir.1980)(same); *R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc.*, 587 F.2d 1315, 1322 (D.C.Cir.1978)(requirements buyer may diminish requirements, even if reductions are disproportionate to the normal prior requirements or to any stated estimate, provided the buyer is acting in good faith").

But it also had an obligation of good faith in determining that volume. *See Julian v. Christopher*, 320 Md. 1, 9, 575 A.2d 735 (1990)(in every contract, " 'there exists an implied covenant that each of the parties thereto will act in good faith,' " including times when a party exercises discretion). Thus, although diligence is at the core of best efforts, First Union also has an obligation to act in good faith. The jury may have determined that First Union, under the circumstances, did not act in good faith in exercising diligence, even though the best efforts clause did not create a specific obligation to direct a certain percentage of First Union's transactions to 3S. We do not read the damage award as an indication that the jury concluded that the parties made a specific agreement to give a certain percentage, but rather as a determination by the jury, after the fact, of what level of business would have resulted from reasonably diligent efforts.

## 85% Of First Union's Business Volume

First Union attacks the jury verdict for contract damages on the ground that it rested on the jury's finding that the bank was obligated to refer as much as 85% of its business to 3S. It complains that neither the SA, the negotiations preceding the SA, nor the parties' course of dealing supported the conclusion that First Union was obligated to refer 85% of its business to 3S. We are not persuaded by this argument because, as we explain below, the jury may have concluded that a much smaller percentage was required under the SA.

The special verdict form did not ask the jury to specify exactly how many transactions the jury decided First Union should have referred to 3S. Nor is this number immediately apparent from the jury verdict, because, in calculating the damage award, the jury had to make an assumption as to what profit per transaction 3S could have made had First Union completely fulfilled its obligations. In reviewing the denial of a JNOV, we consider all inferences from the evidence in the light most favorable to the party against whom the motion is made. See *Impala Platinum, Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 327, 389 A.2d 887 (1978). If there is any legally relevant and competent evidence, however slight, from which a jury rationally could have found in the plaintiff's favor, the motion for JNOV must be denied. See *Jacobs v. Flynn*, 131 Md.App. 342, 353, 749 A.2d 174, *cert. denied sub. nom. Kishel v. Jacobs*, 359 Md. 669, 755 A.2d 1140 (2000).

Applying these principles here, we have ascertained the lowest percentage of First Union's business that could have resulted in the damage verdict awarded by the jury. We first conclude that the jury could have utilized an incremental profit per transaction of $70, which was the profit assigned by 3S's expert in his testimony.[24] Using this figure, we compute that the jury may have found that 3S was entitled to 42.5% of First Union's transactions for the period January 1, 1998 to

---

24. The expert testified that this was the average incremental profit per transaction over the years in question.

April 30, 2000, and 51% for the period May 1, 2000 through April 30, 2001.[25] Alternatively, the jury could have simply determined that 3S was entitled to 535,376 transactions, which is 46.1% of First Union's loan volume during these same periods. They could have computed the total damages award ($37,476,342) by multiplying this 535,376 by the $70 average incremental profit.

We previously reviewed the negotiations leading up to the SA during which First Union refused to agree to commit itself to a specific percentage of business. We do not know why it did that, or why it decided to commit itself to the best efforts clause. In deciding to commit itself to the non-specific standard created by the best efforts clause, however, First Union took a risk as to what volume level the trier of fact would determine that good faith diligence required.

A reasonable person could conclude that First Union was contractually required to send 3S one of these percentages of its business, after considering such factors as the amount of business 3S was getting before the SA,[26] the contract provision for a "ramp-up" period (suggesting that business would increase), the timeliness and high quality of the service provided by 3S, the smooth operation of the centralized and automated service, the ease with which 3S adjusted to the bank's huge expansions, and the downward adjustments in pricing offered by 3S. A reasonable person could have reached this conclu-

---

**25.** The damage award for the period from January 1, 1998 to April 30, 2000 was $21,240,614. Assuming an incremental profit per transaction of $70, this meant the jury decided that 3S was entitled to 303,437 transactions ($21,240,614 divided by $70). 303,437 transactions represents 42.5% of 713,567, First Union's total transactions for this period. For the period May 1, 2000 to April 30, 2001, the jury awarded $16,235,728. Dividing this by 70, we arrive at 231,938 as the number of transaction First Union should have referred to 3S. This number divided by First Union's total transactions for the period, 448,167, equals 51.8%. If the jury used a single transactions number for the total award of 535,376, which is 46.1% of the bank's volume, they could have just allocated it between the two time periods on the verdict sheet.

**26.** 3S received approximately 1,500 transactions per month in the latter months of 1997, before the SA.

sion, taking into account the bank's need to spread its risk among several vendors. Given the large volume of business enjoyed by First Union, a rational person could conclude that preserving for other vendors 48—58% of its business would enable the bank to preserve good business relationships with those other vendors.[27]

Again, we distinguish 3S's breach of contract claim from its fraud claim. The evidence does not support the claim that Clewis fraudulently knew in advance that he was committing to a volume equal to a specific percent of the bank's business, and never intended to comply. Nevertheless, he did agree, on behalf of the bank, to a non-specific best efforts standard that would allow the jury to find that 42–52% of business was required to meet the diligence requirement of a best efforts clause under the circumstances. In other words, we think that the parties set up a standard, rather than a specific percentage, and that Clewis, in saying he never intended to refer more than 50% of the bank's business, may not have anticipated fully what that standard could mean to a jury. His view was backed up by the non-exclusivity provision in Section 2.1, and the 130% Clause, suggesting that it was within the bank's discretion how much to send. But the jury may have interpreted the 130% Clause to be intended only for the protection of 3S, giving it notice of expected increases in demand for services, as Steele testified.

The key is that there was more than one reasonable inter-pretation of the provisions in the SA. This is why the trial court held that it was ambiguous, and allowed the parties to introduce extrinsic evidence to explain its meaning. The

---

**27.** First Union's volume of transactions for 1999 and 2000, was 415,274 and 419,928, respectively. 48% of these volumes equaled 199,331 trans-actions and 201,565 transactions, respectively. If a vendor's profit per transaction was $70, the volume of First Union business to spread among 3S's competitors would equal between $13,953,170 and $14,109,580. We cannot say that it is irrational to conclude that the bank could maintain good relations with two other vendors, and there-by protect its own interests, by referring each of them annual business approximating $7 million.

jury's task was to interpret the agreement, and it did so, within the bounds of a rational fact finder.

## 3S's Failure To Assert Its Rights Under The Best Efforts Clause

■■■■ First Union urges that 3S's "interpretation of the best efforts clause is also decisively belied by the fact that, despite many occasions when it would have been natural to do so, 3S never asserted that it had a contractual right to anything beyond the 1,000 transaction per month minimum[.]" We agree that it is odd that 3S never mentioned the best efforts clause when First Union decreased the volume of business going to 3S. We do not agree, however, that this failure constitutes grounds to reverse the jury's decision to enforce the best efforts clause. There is no dispute that the clause appeared in the contract. Because the clause was ambiguous, the jury had the job of determining what, if anything, it meant. The jury considered all of the evidence about the best efforts clause, and obviously found it to be enforceable. Although First Union doesn't use the term "waiver," the underpinning of the bank's argument seems to be waiver. Whether waiver exists is a question of fact for the jury, "for the determination of its existence *vel non* turns on the intent of the party ostensibly waiving the right, a state of mind which is to be derived from the facts and circumstances surrounding the purported relinquishment." *St. Paul Fire & Marine Ins. Co. v. Molloy,* 291 Md. 139, 145, 433 A.2d 1135 (1981).

## Conclusion Regarding Breach of Contract

In sum, we hold that the best efforts clause of the SA was not too vague to be enforced and there was sufficient evidence to support the damage award. Accordingly, we affirm the judgment for damages for breach of contract in the amount of $37,476,342.

## III.

### Dr. Jaynes's Testimony Regarding 3S's Damages

■■■■ First Union also complains that 3S's proof of damages rested on the testimony of economist Dr. Gerald Jaynes, which

should not have been admitted. First Union argues that Dr. Jaynes constructed a model that

> purported to account for the incremental revenue and costs that 3S would have received and incurred ... had [First Union] sent 3S 90 percent of the transactions generated by all of its branches nationwide, limited only by 3S's capacity .... [a] model [that] had no foundation in the evidence. It ignored 3S's actual performance and capacity; it rested on spectacularly unrealistic growth assumptions; and it disregarded market conditions.... "An expert's opinion has no probative force unless there is a sufficient basis upon which to support his conclusions."

First Union's primary complaint is that Dr. Jaynes "did not take into account 3S's actual performance—its rate of capacity growth and its cost and revenue structure—during the time period in question." It also complains that "Jaynes himself had no idea how many employees 3S actually had at any of the relevant times, and he did not research market employment conditions as a means of determining whether the company would have been able to hire enough people to meet those rates of growth."

We are not persuaded by First Union's contentions because we think they all address merely the weight to be given the expert testimony, not its admissibility. Dr. Jaynes was well qualified as an economist, and he aided the jury by providing a model for calculating damages, based on certain assumptions. *See* Md. Rule 5–702 (expert testimony may be admitted if the court determines it will assist the trier of fact to determine a fact in issue).

Although 3S's actual per transaction profit differed from his assumptions, Jaynes's role was to project what 3S's per transaction profit potentially **could** have been with a much higher volume of transactions. Dr. Jaynes testified that higher volumes would have produced greater incremental revenue per transaction because of economies of scale, while fixed costs would have remained the same. We are unwilling to say that expert testimony based on the familiar business wisdom that

one can earn a higher profit per transaction with a higher volume of business, is so unrealistic as to be without foundation and inadmissible.

Dr. Jaynes's assumptions as to capacity also are based in reason. Jaynes described the work he did in the course of preparing his testimony on damages.

> I looked at the counts or tax documents of Steele Software and various other documents for pertaining to that business, and I also made several site visits to Steele Software to examine the operation of that business and talk to Mr. Steele and people working for him.

> Now, the primary reason for that was because one of the first things that an economist would have to do, in attempting to build a model of this kind, is to attempt to model what we would call the production function or basically in more lay terms to a model [sic] the process by which Steele Software does appraisals and titles. And how they evaluate those and how, in effect, they run their business to make decisions on the amounts of time it would take to do a particular kind of appraisal versus a title because how many Steele Software could do over a given length of time was going to be a very important factor in determining what the damages were.

Jaynes prepared the chart that we earlier set forth in part, which included a column showing 3S's capacity to produce titles and appraisals on a monthly basis from January 1998 into 2003.[28] For January 1998, he used a capacity of 3,000 per month, which he said was "a very small number which I already knew was probably lower than what Steele's capacity actually was as a[n] initial basis point." He then

> [increased] that by 1,000 units a month because that was lower than all of the evidence that I had seen for the amount of . . . growth in employees and therefore capacity

---

28. The chart extended beyond the period that the jury found to be the term of the SA.

of appraisals and titles that could be produced by Steele would be. That took me to May 1998.

For the period after May 1998, Jaynes used information he had received from a letter 3S wrote to First Union on August 31, 1998, stating that 3S had " 'geared up' and staffed [its] organization" to handle 500 transactions per day, beginning September 8, 1998, and 650 transactions per day, beginning October 5, 1998. Taking the October numbers, Jaynes used 14,500 capacity for October 1998.[29] He then worked back from these to "allow [3S's] capacity to increase between May and October by an amount which would give them that capacity when the fall arrived." He made clear repeatedly that the numbers he assigned for each month were estimates and projections. For the period after October 1998, he allocated increased capacity based on the theory that, with appropriate advance notice, 3S could expand its business capacity to meet the available demand by hiring more people.

Although 3S may not have actually possessed the capacity projected by Dr. Jaynes, it is rational to suppose that, if First Union had referred a higher volume of business to 3S, then 3S could have increased its capacity accordingly. As Dr. Jaynes explained, the SA required First Union to give it advance notice of big increases in transactions, which would allow 3S to increase its capacity in preparation for them. The question of whether Jaynes researched the availability of new employees in the marketplace was a subject that First Union had the opportunity to cover in cross-examination. It also could be addressed by First Union's experts. We cannot say that the trial court abused its discretion in admitting Jaynes' testimony. Nor can we say that the damage evidence was insufficient to support the $37 million verdict for breach of contract.[30]

---

**29.** Twenty three weekdays in October, multiplied by 650 transactions per weekday equals 14,950 for the month of October.

**30.** Notably, this verdict was considerably less than the $140 million projected by Dr. Jaynes.

First Union also complains that the trial court improperly limited its cross-examination of Dr. Jaynes when it declined to allow the bank to cross-examine him about his methodology in computing damages by using 3S's tax returns or actual profit figures. First Union was permitted to ask Dr. Jaynes several times during cross-examination whether, in calculating his damage model, Jaynes had looked at "actual" capacity or capability at particular points. Jaynes responded that, although he looked at actual capacity for 1997 and 1998, used actual November 1997 capacity as a starting point, and looked at November 1998 capacity, his damages model was not based on actual capacity. He explained that actual capacity was "pretty much irrelevant to calculating the damages[,]" and his model was based "on the difference between what actually happened and what should have happened if the contract were honored." He explained that 3S could increase its capacity by hiring new employees and taking other steps. His model was based on the "assumption that the contract had started in November of '97 and was working smoothly and that they were given warning that the transactions that they would need to be doing in any subsequent months might be increasing."

First Union also asked Dr. Jaynes how the profits he projected "matched up" to what 3S's actual profit per transaction was over the history of 3S, attempting to use 3S's tax return and profit and loss statement to do so. When 3S objected, the court agreed with 3S that "he's comparing apples to oranges," and suggested that First Union ask what "figure that he used, was it gross or net after deductions in taxes?" Counsel for First Union then insisted:

He didn't use either figure. No, I have the right to cross-examine the witness. They put $140 million number out there and I want to show that he is ignoring reality in coming up with this model of things.

So I want to show him reality and then I'm going to ask him to do some calculations and compare his methods to the real world and I think I'm perfectly entitled to do that, Judge. . . .

He used a model based in part on actuals and he tried to account for actual costs, and I think he didn't account for those costs and I'm going to take him through his model.

The court sustained 3S's objection:

I agree. It's confusing. You want to get into specific examples that would detract from any extrapolation that he made or any interpolation that he made with regard to the existing figures, the past figures like when he backed in, but this doesn't even resemble what he testified to . . . .

It's because it's a model that represents what gross receipts he would have received had the defendant used best effort to send the transactions to [3S]. That's why, that's why he's right when he says this is not relevant and not probative of his testimony.

A trial court has discretion to control the scope of cross-examination. *See Wrobleski v. de Lara*, 353 Md. 509, 525, 727 A.2d 930 (1999). Here, First Union obtained Jaynes's admission several times that his models were not based on actual profit per transaction earned by 3S. What it was not allowed to do was to compare 3S's actual expenses and earnings with Jaynes's model. To be sure, it would have been within the trial court's discretion to allow such cross-examination. In light of Jaynes's protestations that his model was not based on actual expenses or actual capacity, however, we do not consider the trial court's ruling excluding more detailed exploration of this point to be an abuse of discretion.

Even if the trial court erred, moreover, First Union suffered no prejudice because both of its economic experts criticized Dr. Jaynes for failing to base his damage model solely on 3S's historical profits. Further, one of the bank's experts testified about his detailed calculation of damages solely using 3S's historical experience. None of these figures were contradicted by Jaynes because he simply said that actual figures were irrelevant to his damage calculations. Thus, the jury had sufficient basis to reject Jaynes' testimony if it wished to do so.

## IV.

## Geographic Scope Of The SA

▮ Finally, First Union contends that, "[e]ven if [First Union] had an enforceable duty pursuant to the 'best efforts' clause, that duty extended only to the six-state region specified in Exhibit A.1.0 of the [SA], not to [First Union's] entire nationwide footprint." It points out that Section 2.1 of the SA granted 3S "the right to perform the Services and Reports as listed in Exhibit [A.1] as attached hereto." It argues that Exhibit "A"1.0, which was part of Exhibit A.1, listed only six states: Georgia, Tennessee, North Carolina, South Carolina, Virginia, and Maryland.

The SA was entered by "First Union and its Affiliates," [31] and the body of the agreement contains no geographic limitation regarding which First Union branches are included. In the SA, " 'Exhibit A' refers to 'Exhibit A.1' attached." "Exhibit A.1," which is attached, states that 3S "will provide to [First Union] and its affiliates (collectively 'First Union National Bank'), the following Services and Reports, at the prices as listed below." After some general provisions about pricing (not a price list), the following services are listed under the heading, "Traditional Service/Report Pricing and Turnaround Time": Title Report, Recording Service, Drive–By Evaluation (referred to as "DB"), Appraisal Report (referred to as "AP"), Automated Ownership Verification and RealValue Report, and Tax Assessment Confirmation. Next to each listed service item are set forth details about the nature of the service and/or the timing of completion. The specifics regarding the Title Report, the Drive–By Evaluation, and the Appraisal Report, each say "see Attached Chart for Pricing." There is no geographical limitation in the description of services on Exhibit A.1.

---

**31.** "Affiliates" is defined to mean, "with respect to any entity, any other entity controlling or controlled by, or under control with such entity now or any time during the Agreement."

Attached to Exhibit A.1, however, is a document titled "Exhibit 'A'1.0, Pricing as of 11/21/97[,]" which lists counties in Georgia, Maryland, North Carolina, South Carolina, Tennessee, and Virginia, and assigns prices to three different services for properties located in those counties.[32] Although it does not argue on appeal that the SA was unambiguous in its favor, First Union relies heavily on this price list to support its argument that the SA was only intended to cover First Union operations within those six states.

The trial court held that the SA was ambiguous with respect to geographic scope, and allowed extrinsic evidence of intent. Although we are not asked to review this ruling, the contract itself is our starting point for resolving the question we are asked to review, *i.e.*, whether the evidence supported the award of damages for failure to refer title and appraisal work to 3S relating to loans outside the six state footprint. Section 2.1 of the SA says that 3S has the "right to perform the Services and Reports as listed in Exhibit [A.1] attached." The best efforts clause says that, "For all of the Services and Reports, as required by First Union for Residential Real Estate secured loans, First Union will use [its] best efforts to direct these transactions to Steele[.]" A natural placement for a geographical limitation to either of these clauses would have been either in the body of section 2.1, or in Exhibit A.1, which describes the nature of the Services included in the agreement.

While it is clear that the parties were relying on Exhibit "A"1.0 to designate prices for the services, it is not as clear that the failure to designate prices for services relating to properties outside the six state area necessarily meant that a geographical restriction was imposed on the contract. Nowhere on Exhibit "A"1.0 is there a clear statement of intent to impose a limitation, such as, " 'Services and Reports' as de-

---

**32.** These are "AP", "DB" and "TA." It is apparent that "AP" means Appraisal Report, "DB" means Drive–By Evaluation. "TA" may mean the Title Report, which is often referred to as a "title abstract."

fined on Exhibit A.1 shall be limited to the following states." [33]
It is quite possible that 3S only listed the six state area on
Exhibit A1.0 because it had not yet developed pricing for the
other states. Indeed, Exhibit A.1 states

> [D]uring the term of this Agreement, ... Services or Re-
> ports may be modified, other Services or Reports may be
> added, or if pricing changes are made, a revised "Exhibit
> A", with a new numerical decimal suffix and effective date,
> will be provided to [First Union], at the notification address
> as per the Agreement.

There was significant extrinsic evidence offered by both
parties. This included evidence as to the parties' construction
of the contract after its execution. *See Anne Arundel County
v. Crofton Corp.*, 286 Md. 666, 673, 410 A.2d 228 (1980)(when
contract is ambiguous, the trier of fact determines the intent
and purpose of the parties by considering the circumstances
and conditions affecting the parties at time of execution, and
their subsequent conduct and construction); *Nat'l Union
Mort. Corp. v. Potomac Consol. Debenture Corp.*, 178 Md. 658,
674, 16 A.2d 866 (1940)(construction placed by parties after
execution and before controversy has arisen, is extremely
significant in determining intention).

There was evidence supporting 3S's interpretation that the
SA had no geographical limitation. Shortly after execution of
the SA, on February 3, 1998, 3S sent Thompson a nationwide
price list. He testified that he did so pursuant to the authori-
ty to modify pricing given to 3S on Exhibit A.1.[34] Although ·

---

**33.** At the bottom of the page, appears the following: "All other counties
not listed above are considered to be rural and will be a charge of $275
for AP, $175 for DB, and $100 for TA." This provision could be
interpreted to favor either party. It could mean that counties outside
the six state area are included. Or it could mean that since all other
areas are designated as rural, the parties did not intend to cover other
states, which obviously have non-rural areas.

**34.** This authority was limited by 3S's promise to change prices not
more than once per year, and to limit each increase to not more than
10% of the existing price.

this nationwide list was not designed as Exhibit "A.1.0," Steele explained this was so

> because it was being attached to the first one, sir. . . . [I]t was being attached to the original A.1. It wasn't not replacing that, sir. . . . If you look at Maryland, Georgia, and the other states, those will match up exactly with the existing price list, and this was to be a part of that. . . . It was adding to it, sir.

The nationwide price list was sent to Thompson. The transmittal of this price list suggests that 3S considered the scope to be nationwide at a time when the parties were not in dispute about the meaning of the SA, and is thus evidence as to its meaning. *See Nat'l Union Mort.,* 178 Md. at 674, 16 A.2d 866 (construction by party before dispute arises is significant). Steele also testified that the Exhibit "A"1.0 price list was not intended to limit the geographical scope of the SA. He testified, "**there was no limitation . . . with anyone that we ever talked with at First Union regarding geographical limitation. . . . [T]hey wanted us to do the transactions wherever they were.**" (Emphasis added.) The first people to assert to Steele that the price list was intended to limit the geographical scope of the SA were the defense attorneys in this case.

That First Union, in turn, paid 3S for 8,0000 transactions outside the states listed on the original price list supports 3S's interpretation that the SA covered more than six states.[35] 3S's pre-contract provision of services through First Union's direct marketing program to 2,000 branches of First Union, which covered far more than the six-state area, also corroborates 3S's interpretation of the SA.

Trent Thompson also testified that affiliate First Union Direct, which was First Union's direct marketing arm, en-

---

**35.** First Union argues that payment for invoices for areas outside the six state area does not **necessarily** mean that the bank was obligated under the SA to refer business outside the six states. We agree that alternate inferences can be drawn, but all that is necessary to sustain the verdict is that the jury's inference be a permissible one.

gaged in nationwide transactions. Thus, the inclusion of "Affiliates" as parties to the contract could be interpreted to mean that the parties intended to cover a greater geographic scope than the six states in which Clewis directly operated.[36]

First Union argues that, even if the SA could be interpreted to include a nationwide area, extrinsic evidence showed that neither Clewis nor Thompson had authority beyond the regions specified on the price list. Specifically, First Union urges that "Steele conceded that Clewis and Thompson had 'no ability to direct transactions out of either the New Jersey service center or the Jacksonville service center' until 'they consolidated the operations' in March 1999[.]" Steele did, indeed, acknowledge that, "not until they consolidated the operations would they have the ability to do that." First Union, however, ignores his testimony given a few moments later:

> I don't say they couldn't, sir. They were not taking that approach from a political standpoint internally, sir. They were merged banks. They were, you know, it's a political football going on. . . . I believe [Clewis] had the authority, sir. He bound it for First Union National Bank, whether they politically did it internally, sir, that's a different issue.

The jury may have chosen to believe this latter statement accurately reflected Steele's understanding.

██ During his dealings with First Union, Steele knew that officers at high levels of the bank were aware of the services he offered, and were delegating authority to lower-level officers, such as Dibble and Clewis, to negotiate and formalize a contract. In the early days of the negotiations, this included Doug Crisp, First Union's Senior Officer in charge of the Consumer Credit Division. Later, Clewis and Thompson told Steele that Mr. Pruitt had taken over Crisp's role.

---

**36.** Again, that an alternate inference is also possible, *i.e.*, that First Union only intended to use its direct mail affiliate for transactions within the six-state region, does not bar this inference.

"[S]ince Doug Crisp was no longer there pushing the bank or the consumer credit division that Mr. Pruitt was now involved and they didn't think that they would be able to achieve the transaction levels that we previously in concept agreed to but the intent and commitment was still there with us, . . . but they didn't think they would be able to get the document signed with a large amount of transactions in it."

Thus, during both the 1995–1996 and the 1997 phases of the negotiations, Steele was made to believe that officials holding positions higher than Clewis or Thompson, who presumably had authority to bind the bank outside the six-state area, were overseeing the course of the negotiations. First Union does not point to any evidence that these officers had no authority to bind the bank outside the six-state area, or that Steele had been told they lacked authority.

A June 10, 1996 letter to the bank illustrates Steele's belief that the necessary corporate authority would be obtained before any contract was signed. In that letter, Steele asked First Union officer Morgan Smith to "expedite the approvals of these final changes through any channels necessary. Once reviewed by First Union, we will prepare two originals for execution." Steele was also aware that Clewis had given versions of the SA to First Union's legal department for review.

It is not required that 3S prove that Clewis had actual authority, if the evidence is sufficient to show apparent authority. "In order to establish that [Clewis] was clothed with at least apparent authority to enter the subject agreement, [3S was] required to prove that the actions of [Clewis], when reasonably interpreted by [3S] gave rise to apparent authority and that [3S's] reliance on such actions was reasonable." *Atl. Richfield Co. v. Sybert*, 51 Md.App. 74, 84, 441 A.2d 1079 (1982), *aff'd*, 295 Md. 347, 456 A.2d 20 (1983). Our examination of the record reveals sufficient evidence for a jury to infer that Steele reasonably thought Clewis, a senior vice-president who received direction from above, had authority to bind First

Union to a contract for services outside the six-state area. The record also includes sufficient evidence for the jury to conclude that the parties did not intend to limit the SA to the six-state area.

**JUDGMENT FOR BREACH OF CONTRACT AFFIRMED. JUDGMENT FOR FRAUD, INCLUDING COMPENSATORY AND PUNITIVE DAMAGES, REVERSED. COSTS TO BE PAID ½ BY APPELLANT, ½ BY APPELLEE.**

THEODORE G. BLOOM, Judge, Retired, Specially Assigned, concurring.

I concur in the opinion written for the Court by Judge Adkins, but for a different reason than that set forth in that opinion with respect to reversal of the verdict and judgment in favor of appellee on its claim for fraud.

In its brief, appellee referred to evidence that indicated that the phrase "best efforts" that was inserted in the written contract between the parties had a special meaning. Further references to that evidence were made during oral argument. I agree with the majority opinion that the "best efforts" phrase (absent some special meaning) was too ambiguous, too general, to serve as a basis for a claim of fraudulent inducement to enter into a contract that appellant never had any intention to perform. Appellee refers however, to testimony by Mr. Steele that, in negotiations between him and Parkes Dibble, one of appellant's vice-presidents, the term "best efforts" had been given a particular meaning: Dibble told him that "they could send all the transactions he could and that [Steele] could handle." Mr. Steele understood that "best efforts" meant that appellee would receive approximately 85% to 90% of appellant's transactions, provided appellee had the capacity to handle that many transactions.

There was also testimony to the effect that, when Senior Vice-president Bill Clewis succeeded Dibble as appellant's agent in negotiating the terms of the contract between the parties, he told Mr. Steele "not to worry. Nothing's changed,"

and that "[Clewis] was aware of what [Steele] had discussed with Parkes [Dibble] and we are the company." That evidence, coupled with testimony by Clewis that, under no circumstances would appellee receive more than 50% of the transactions that the bank would refer for processing, could, I believe, have supported a finding that appellee had been induced to enter into the Service Agreement by appellant's fraudulent representation that appellant would refer to appellee all of the transactions covered by the agreement that appellant had and that appellee could handle.

That theory of "fraudulent inducement," based on a special agreed meaning of best efforts, however, was never presented to the jury for its consideration. With respect to the "best efforts" provision in the Service Agreement, the trial judge instructed the jury as follows:

> In this contract it calls for best efforts. Best efforts clauses impose an obligation to act with good faith in light of one's own capabilities.
>
> Good faith is defined as follows: good faith is an intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief the absence of design to defraud or to seek unconscionable advantage and an individual's personal good faith is concept of his own mind and inner spirit. Honesty of intention and freedom from knowledge of circumstances which ought to put the holder upon inquiry.
>
> In common usage this term is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking means being faithful to one's duty or obligation.

That instruction is consistent with the majority opinion's thorough discussion of the meanings that courts and writers on the subject have ascribed to the phrase "best efforts" in contacts. I agree with the conclusion in the majority opinion that the "best efforts" phrase in the Service Agreement between the parties, and as defined by the court in its instructions to the jury, was too ambiguous to support appel-

lee's claim of fraud in the inducement, although it is sufficient to support the breach of contract verdict.

The court did instruct the jury that the plaintiff's claim that it was promised a long-term relationship "is relevant only to the fraud in the inducement claim," and that appellee's attorney did stress that point in his argument to the jury. I agree with the majority opinion, however, in its conclusion that, in light of the short-term provisions in the Service Agreement, appellee could not have relied on the "long-term relationship" assurances as a basis for its fraud claim.